IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| LORI SAROYA,<br><br>           Plaintiff,<br><br>v.<br><br>CAIR FOUNDATION, INC. d/b/a<br>COUNCIL ON AMERICAN-<br>ISLAMIC RELATIONS & CAIR,<br><br>      Defendant. | Civil Action No.: _____ |

## COMPLAINT AND JURY DEMAND

### Introduction

1.     This defamation action is brought by Lori Saroya, a respected and accomplished community leader who has a proven track record as a champion of civil rights and women's rights, against CAIR Foundation, Inc., d/b/a Council on American-Islamic Relations and CAIR ("CAIR") for its purposeful and purposefully wide publication of an outrageously false press statement accusing Ms. Saroya of violating both federal and state law.  CAIR did so as part of a concerted effort to blacken her reputation, destroy her credibility, and silence her and others who have raised serious concerns about CAIR's abuse of women, dishonest practices, and violations of civil rights, among others.  Ms. Saroya, as a former Executive Director of CAIR-Minnesota, has been vocal with her concerns about the harassing, discriminatory, dishonest and, in certain cases, abusive conduct by CAIR leaders, and CAIR's heavy-handed and intimidating tactics aimed at covering that

conduct up.

2.      In an effort to silence Ms. Saroya, who was a private figure at all relevant periods of time, and to obfuscate the fact that CAIR had to dismiss, with prejudice, its prior lawsuit against her based on this Court's rulings, CAIR published, on January 20, 2022, an outrageously false and defamatory Press Release on its website and in other forms to a worldwide audience, asserting repeatedly that she had violated state and federal law by engaging in "cyberstalking," knowing that such assertions were not only false, but defamatory per se.  CAIR's defamatory Press Release targeting Ms. Saroya was particularly brazen because it also publicly misrepresented the findings and rulings of this very Court in CAIR's prior unsuccessful defamation action in which it had attempted to silence Ms. Saroya.

3.      In May of 2021, CAIR filed a 130-page Complaint in this very Court ironically accusing Ms. Saroya of defamation, seeking not only damages but an injunction designed to silence Ms. Saroya about her experience with CAIR (the "CAIR Action").  CAIR's allegations, on their face, were non-viable because they were either Constitutionally-protected opinions or were barred by the applicable statute of limitations, quite apart from the fact that the opinions were well-supported.  Ms. Saroya was not silenced and vigorously defended herself against CAIR's allegations.  She both moved to compel CAIR to produce discovery that it refused to produce regarding CAIR's extensive history of engaging in religious and gender discrimination, sexual misconduct and harassment, and retaliation within the national organization and its local chapters, and moved to dismiss the CAIR Action

-2-

51606110.4

based on numerous legal deficiencies.

4.      On December 13, 2021, this Court (Nelson, J.) held a hearing raising concerns that the CAIR Action against Ms. Saroya did not actually allege any actionable conduct.  Specifically, Judge Susan Richard Nelson interrupted CAIR's attorneys during their oral argument and stated, " . . . I appreciate that a complaint can certainly create context and tell a story and your complaint does that, but it's very hard to sort out what is actionable and what's not.  It's not at all hard to see what you believe is defamatory, but what is actionable and not actionable is not clear at all from the face of the complaint." (*See* **Exhibit 1** (Hearing Transcript at 23) (emphasis added).) Judge Nelson also stated that she "would like to see precisely what you believe is verifiable.  Not opinion.  And there's so much of that in your complaint.  So much general unrest and opinion."  (*Id.* at 24 (emphasis added).) Judge Nelson then ordered CAIR to file a narrowed amended complaint within two weeks, noting:

> And I want there to be a lot of -- I want to see a lot of discipline in that because the -- a lot of these complaints, although they may be valid, they may be defamatory, they are not actionable.  I mean, we really have to get down to what's actionable and what's clear.
>
> This is especially true of the statute of limitations.  There will be an opportunity to provide the jury with context, but there can't be any confusion that statements made outside of the statute are somehow actionable.  So I want to see a lot of discipline to this amendment; and once that's done, I invite the defense to make a decision about what you chose to do next.

(*Id.* at 30 (emphasis added).)

5.      With discovery motions pending that may well have forced CAIR to

disclose evidence that could prove the truth of statements CAIR claimed were defamatory, and an order from the Court that CAIR refile a new Complaint to avoid dismissal, CAIR effectively admitted defeat and decided to voluntarily dismiss its action against Ms. Saroya in its entirety with prejudice.  The Court dismissed the CAIR Action on January 11, 2022.

6.     Knowing that it was unable to silence Ms. Saroya with its prior lawsuit, which was dismissed with prejudice, and concerned that attention would turn to its defeat, CAIR decided to issue the Press Release, not only falsely accusing her of "cyberstalking," but remarkably claiming: ". . . Lori was not able to defeat our lawsuit.  A few weeks ago, the judge overseeing the case ruled in our favor and denied Lori's motion to dismiss our lawsuit."  (Emphasis added).   CAIR's statements were published with Constitutional Malice because CAIR knew that they were false.  By way of limited example, CAIR knew: (i) Ms. Saroya had not violated any criminal statute, much less the state and federal cyberstalking statutes; (ii) CAIR had never made any complaint to any state or federal law enforcement agency contending that Ms. Saroya had engaged in any "cyberstalking"; (iii) Ms. Saroya had never been investigated by any entity for "cyberstalking"; and (iv) precisely what Judge Nelson had said about CAIR's claims being non-actionable and that there was a transcript reflecting precisely what she had said.

7.     As a result of CAIR's knowing and reckless publications of outrageously false and defamatory statements, Ms. Saroya has suffered significant injury to her reputation and emotional distress, including in the form of online

-4-

bullying and harassment, alienation from members of her religious community, and loss of employment opportunities. She seeks compensatory and consequential damages and injunctive relief. In support of this Complaint, Ms. Saroya alleges the following:

## PARTIES

8.      Lori Saroya is an individual and citizen of the State of Minnesota.

9.      Upon information and belief, CAIR Foundation, Inc. is a 501(c)(3) corporation incorporated in the District of Columbia with its headquarters and principal place of business located at 453 New Jersey Avenue S.E., Washington D.C., 20003.

## JURISDICTION AND VENUE

10.     The Court has original jurisdiction pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

11.     This Court has personal jurisdiction over CAIR because CAIR has continuously and systematically directed its activities at residents of this state, including for example through its relationship with its Minnesota chapter and through soliciting donations of Minnesota residents; has purposefully derived benefit from its business activities in this state; has created a substantial connection with this state; has deliberately engaged in significant activities within this state; and has created continuing obligations between itself and residents of this state. Further, CAIR has caused significant harm to Ms. Saroya in Minnesota. As such,

Minnesota has a substantial interest in providing a forum, and the burden placed on CAIR by being brought under this Court's jurisdiction does not violate traditional notions of fair play and substantial justice.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because CAIR is subject to personal jurisdiction in this Court, a substantial part of the events or omissions giving rise to Ms. Saroya's claims occurred in this District, and CAIR's actions were substantially directed at damaging Ms. Saroya in Minnesota and did substantial damage to her here, where she resides.

## FACTUAL BACKGROUND

### CAIR'S History Of Discrimination, Harassment, And Concerning Conduct

13.     CAIR holds itself out publicly as a civil rights organization, while simultaneously engaging in egregious and rampant sexual discrimination, sexual harassment, sexual assault and religious discrimination, and retaliation against those who have either been victimized by such conduct or who have expressed concerns about it.

14.     CAIR spends substantial amounts of donors' money in order to threaten, intimidate and sue those who have the courage to speak about CAIR's culture of discrimination and misogyny, and to attempt to force them to sign agreements by which Muslims around the country, especially women, "sell" their rights to express their concerns about CAIR's practices and agree never to discuss them.

15.     A growing number of former CAIR employees and employees of

-6-

CAIR's chapters around the country have been speaking out about CAIR's practices over the past few years. CAIR spends considerable amounts of resources provided by unsuspecting donors, whom CAIR seeks to keep in the dark, attempting to suppress those individuals. Indeed, CAIR has been sued in courts in various American jurisdictions by those who have been victimized by CAIR officials.

16.     CAIR's practices have also received national media scrutiny. For example, in April 2021, National Public Radio published an exposé regarding well-documented and egregious assault by a CAIR official in Florida, Hassan Shibly.[1]

17.     The ground-breaking exposé also highlighted allegations against CAIR and its complicity in ignoring misconduct by CAIR leaders and its mistreatment of its own staff.

18.     In particular, it referenced a notorious and well-document series of events in 2017, when multiple staff were forced out of the organization for attempting to unionize. At the time, Service Employees International Union (SEIU) 500 wrote: "Disappointed that a civil rights group like #CAIR is trying to stop it's employees from even voting on having a union."

19.     Former CAIR employees and employees of CAIR chapters, which operate effectively as de facto subsidiaries of CAIR, controlled by CAIR and, in

---

[1] *See* Leila Fadel, *Muslim Civil Rights Leader Accused of Harassment, Misconduct*, NPR, April 15, 2021, https://www.npr.org/2021/04/15/984572867/muslim-civil-rights-leader-accused-of-harassment-misconduct.

51606110.4

particular, by its National Executive Director, Nihad Awad ("Awad"), have grown increasingly outspoken about other egregious and improper conduct within CAIR leadership.

20.     The troubling practices raised by those who have worked for CAIR, have served on its national and state boards, and otherwise have personal knowledge of CAIR's practices and operations include:

- Retaliation against CAIR civil rights staff who attempted to unionize;

- Forcing CAIR employees to sign non-disclosure agreements that would silence them for the rest of their lives regarding misconduct within CAIR;

- Eyebrow-raising financial mismanagement, which included, inter alia, hiding from its own Board the sources, nature and magnitude of massive foreign funding of CAIR, problems with "missing" financial records, the failure to file tax returns, and other tax improprieties;

- Sanctioning the illegal and unethical unauthorized practice of law; and

- Discriminating against Shia Muslims, as well as against Christians and Jews, and condoning and covering up hate speech.

## **Ms. Saroya's Employment At CAIR**

21.     One person who has spoken up regarding CAIR and its conduct is Ms. Saroya, who is a highly respected and accomplished community leader with a proven track record as a champion of civil rights and female empowerment.  As an employee and director of CAIR, Ms. Saroya was repeatedly praised by CAIR leadership for her devotion and skill.  She gave most of her adult life to the

51606110.4

organization in hopes that it would fulfill its professed civil rights mission. Sadly, CAIR's internal operations did not adhere to its professed values that it used to fundraise and promote itself publicly.

22. Ms. Saroya's formal involvement with CAIR began in 2007, at CAIR's Minnesota office, where she served as Executive Director.

23. Recruited by CAIR to serve in its national office, Ms. Saroya left her employment with CAIR-Minnesota for a position at CAIR in March 2016.

24. At CAIR, Ms. Saroya served as National Chapter Development Director. She also served on the Board of Directors. In these capacities she participated at a high level in CAIR affairs, and had the opportunity to observe its management and practices, particularly those of CAIR's Executive Director, Nihad Awad, at close range.

25. In this role, Ms. Saroya quickly came to realize that CAIR was violating and/or sought to violate the civil rights of employees or former employees; that its leaders had subjected employees (and others) to sexual harassment, sexual assault, gender discrimination and retaliation; that CAIR maintained a culture of misogyny; that it had been receiving massive amounts of funding from international donors, information about which was kept a strict secret (even from CAIR's Board); that it had been dishonest and misleading with its donors, whose contributions it had frequently misused for the purpose of silencing critics; that its leadership had been dishonest with and breached its fiduciary duties to the CAIR Board; that it had violated basic rules of good governance; and that it had mismanaged the enterprise,

all to the detriment of the causes about which it professed to care.

26.     As an American Muslim woman working for many years in a heavily patriarchal organization such as CAIR, Ms. Saroya was forced to endure and witness unethical, and at times illegal, conduct.  Her courage and principled leadership meant that despite threats and intimidation tactics, she continued to stay focused on her goal of creating civil rights resources for Muslims in every state.

27.     Ms. Saroya also had the courage to speak up during her employment. For example, she repeatedly asked that CAIR investigate allegations into sexual assault, harassment and other forms of abuse by several CAIR leaders, including Hassan Shibly, the head of CAIR's Florida chapter.  Those efforts were repeatedly rebuffed by Mr. Awad, CAIR National Communications Director Ibrahim Hooper ("Hooper"), and other CAIR leaders.

28.     Ms. Saroya was also a victim of sexual misconduct at CAIR.  Mr. Awad, who is married with children, engaged in a pattern of unwelcome and highly inappropriate conduct towards Ms. Saroya, which she deflected and did not accept.

29.     This was the culmination of conduct by Mr. Awad and others at CAIR that had sickened, disappointed and angered Ms. Saroya, who had observed a toxic environment at the highest levels of the organization and at certain chapters overseen by CAIR, an environment which was exacerbated by a culture of impunity.

30.     Indeed, the former Chairman of CAIR, Dr. Parvez Ahmed, wrote a memo to CAIR's Board, recommending that Mr. Awad and Mr. Hooper be removed from their management positions at CAIR because of their lack of transparency,

-10-

issues about foreign undisclosed funding, harassment, non-straightforward financial practices, and other issues, which he believed would undermine the ability of the organization to carry out its stated mission.  However, this recommendation was rejected by the Board, allowing the pattern of discrimination and harassment to continue.

### Ms. Saroya Leaves Her Employment At CAIR, And CAIR Repeatedly Attempts To Silence Her

31.     Ms. Saroya informed Mr. Awad that she intended to leave CAIR.  Mr. Awad implored her to stay and offered her a promotion if she would do so.

32.     When Ms. Saroya told him that she had made up her mind, Mr. Awad asked that she come to see him in his office so that she could "sign some papers," which Ms. Saroya knew would be a separation agreement with confidentiality and non-disparagement provisions that would purport to buy her silence about CAIR.

33.     She informed him that she knew that the organization compelled others to sign such agreements, and that no amount of money would suffice to force her to surrender her right to speak truthfully about CAIR.

34.     Mr. Awad replied that Ms. Saroya should know that "CAIR is a very powerful organization," a statement that Ms. Saroya took, and which was intended, as a threat.

35.     Despite the threat, Ms. Saroya refused to sign documents surrendering her right to speak, even though CAIR owed her back wages and other compensation.

36.     Ms. Saroya thereupon resigned from CAIR effective May 11, 2018,

51606110.4

even though Mr. Awad, who had told her that she was "the best Chapter Development Director [of CAIR] that we have ever had and will ever have," asked her to stay.

37.     Ms. Saroya requested that CAIR pay her earned back wages and other compensation and, when it refused, filed a complaint with the D.C. Office of Wage-Hour, which was denied on procedural grounds at a time when she had emergency surgery followed by physical and occupational therapy, and was unable to prosecute her claims properly.

38.     When she was at CAIR, Ms. Saroya had witnessed and knew of cases of sexually inappropriate behavior, sexual harassment, and discrimination. However, when she left, she was shocked at the sheer number of women, past and present, who revealed their appalling experiences at CAIR's national office and affiliate chapters in a number of CAIR victim support groups and other channels Ms. Saroya joined after her departure.

39.     Ms. Saroya, who like so many other former (and present) CAIR employees, was mindful of CAIR's resources, including massive foreign funding of unknown and often concealed origins, and was therefore wary of its power.

40.     Nevertheless, she became one of a growing number of such individuals to speak out about the sexual harassment, sexual discrimination, sexual assault, retaliation and other problems that are rampant within the CAIR organization.

41.     As a few examples of recent willingness of individuals to speak out

against CAIR:

- On April 15, 2021, National Public Radio, as a result of the groundbreaking work of Muslim-American journalist Leila Fadel, published a well-documented report about allegations of physical and emotional abuse on the part of the head of CAIR's Florida chapter, Hassan Shibly, and about misconduct by CAIR National. NPR interviewed "18 former employees at the national office and several prominent chapters who said there was a general lack of accountability when it came to perceived gender bias, religious bias or mismanagement" at CAIR. The NPR report, based on interviews with a series of women who had been victimized by Shibly, internal CAIR documents, social media posts and emails, portray CAIR's Florida leader "as a man who used his position to seduce women and bully critics with impunity." The individuals interviewed by NPR stated that his actions "were shrouded by a culture of silence," and that "[w]hen concerned parties brought allegations to senior CAIR officials in Washington, D.C. and Florida . . . there was little, if any, follow up action," even though CAIR leaders were aware of Shibly's conduct over four (4) years before he resigned. The NPR report quoted former CAIR National Chairman, Dr. Parvez Ahmed, who left the organization over ten years ago and has been critical of CAIR's treatment of women, as stating: "The leadership of CAIR owes the community an explanation as to who knew what and when and how those complaints were handled."

- On April 16, 2021, a coalition "representing former CAIR employees, board members, and community members who have been victimized by CAIR leaders" issued a press release calling on the resignation of senior leadership at CAIR for a "pattern of covering up abuse and blanket denials . . . ." (*See* **Exhibit 2**.) Indeed, although many CAIR employees, volunteers and community members have experienced harassment, gender discrimination, sexual assault or misogyny, or have been threatened by CAIR, and left feeling disenchanted, broken and hurt, CAIR issued public statements referring to women's experiences at CAIR as "blatant falsehoods" and "smear campaigns." On information and belief, CAIR has refused to create an independent and impartial panel to properly and fully investigate and remedy these issues inside of CAIR;

- Numerous individuals have filed lawsuits against CAIR in connection with its misconduct. *See, e.g.*, *Lopez v. Council on*

*American Islamic Relations Action Network, Inc.*, 826 F.3d 492 (D.C. Cir. 2016) (involving the unauthorized practice of law by a CAIR agent who held himself out as a civil rights lawyer, when he was not an attorney, and who accepted fees for his purported legal services, which CAIR knew); *Saiyed v. Council on American-Islamic Relations Action Network, Inc.*, 346 F. Supp. 3d 88 (D.D.C. 2018) (same); *Afshan v. Council on American-Islamic Relations California*, No. 37-2021-00000977-CU-WT-CTL (Cal. Sup. Ct., San Diego Cty. 2021) (involving allegations by a female public policy coordinator of CAIR's San Diego office of gender discrimination and harassment, as well as religious discrimination against Shia Muslims and Jews); *Arani v. Council on American-Islamic Relations California*, No. 37-2019-00021331-CU-MC-CTL (Cal. Sup. Ct., San Diego Cty. 2019) (involving allegations by a female attorney, who also alleged religious discrimination against Shia Muslims and non-Muslims);

- A number of websites and social media accounts have sprung up around the country, utilized by CAIR employees who share information about their own experiences at CAIR, which often reflect extremely poorly on CAIR's leadership.  These websites include https://wecair.net/ and http://reformcair.com, and social media accounts include https://www.instagram.com/cairvictimsforum, https://twitter.com/wecaircoalition, https://twitter.com/WeCAIRMeToo, and https://twitter.com/altciarnational.  These websites and accounts attract significant attention in substantial part because a growing number of American Muslims have experienced first-hand, or heard about, a culture of misconduct and retaliation at CAIR.

42.    For her part, beginning in fall 2018, and continuing into spring 2021, Ms. Saroya took to social media and public websites to post information relating to her experiences at CAIR, including without limitation:

- CAIR's failure to pay Ms. Saroya funds that it owed her;

- CAIR's discrimination against women, including sexual harassment, retaliation and hostile work environment;

- CAIR's "union busting";

-14-

- CAIR's financial mismanagement, lack of board oversight, and board incompetence;

- CAIR's constant negative portrayal of Muslims as victims in the media;

- CAIR making mistakes on peoples' cases and providing inconsistent services;

- CAIR receiving international funding through its Washington Trust Foundation; and

- Issues of religious discrimination.

43.     Moreover, as a practicing Muslim, Ms. Saroya felt religiously bound to expose injustice and wrongdoing – including financial misconduct.  The latter is extremely important because CAIR is a 'Zakat-approved' charity – which means it is a beneficiary of the duty of all Muslims to give away a certain amount of their income annually.  If Ms. Saroya had personal knowledge that money was being misused or that a Zakat-funded charity was mistreating its staff and behaving in an un-Islamic way, then she would be complicit if she remained silent.  This duty weighed heavily on her conscience and dictated her conduct – particularly in informing unsuspecting community members and other organizations about the true nature of CAIR.

44.     On November 12, 2020, Ms. Saroya wrote to a CAIR lawyer named Faisal Gill "to request a private meeting with the National Council via Zoom (with at least 75% in attendance) to share a report on the civil rights abuses inside CAIR and recommendations.  Both the report and presentation will remain confidential."

45.     On November 24, 2020, Ms. Saroya wrote again to Mr. Gill and

-15-

stated, "I would like to present a confidential report on allegations of civil rights abuse inside CAIR to CAIR's leadership.  In the spirit of compromise, I will let you determine whether that includes the National Council, CAIR-MN or some other committee."

46.     Shortly thereafter, in December 2020, precisely because CAIR knew that it did in fact owe Ms. Saroya the back wages and compensation that she maintained it owed her, CAIR reached out to her to offer to pay her the money it owed her.  But it sought to make this payment contingent on her agreement not to make any "negative" statements about CAIR.

47.     In doing so, CAIR continued to attempt to condition its payment of the compensation it owed Ms. Saroya on her agreement to stay silent about what she knew and what she had observed about sexual harassment, discrimination, misogyny, retaliation and other misconduct at CAIR, including at its highest levels.

48.     As another example, in late April 2021, CAIR attempted to condition payment of the funds it knew it owed Ms. Saroya on yet another agreement from Ms. Saroya to refrain from stating anything "negative" about CAIR, an agreement to remove from social media anything critical of CAIR and, indeed, an agreement to recant her past criticisms of CAIR.

49.     CAIR demanded that she sign a draconian document that would take away her right to free expression, which so clearly evidences CAIR's ongoing attempt to stifle criticism and keep its misconduct hidden from public view that it is worthy of quoting in full the pertinent language to which CAIR demanded Ms.

-16-

Saroya agree as a condition of her simply receiving what it knew she was owed:

> **NON-DISPARAGEMENT.**   After the Effective Date of this Agreement Ms. Saroya agrees not to make any statement or digital content or cause anyone else to make statements or digital content that are intended to become public, or that should reasonably be expected to become public, and that criticizes, ridicules, disparages or is otherwise derogatory of CAIR or that characterizes CAIR in a negative light.  In the case of statements about CAIR, Ms. Saroya agrees that this non-disparagement provision extends to CAIR's subsidiaries, affiliates, and present and former employees, officers, directors and affiliate employees, officers, and directors.  Ms. Saroya shall not make any derogatory or negative statements about her employment at CAIR, her time as a Board member with CAIR, or the circumstances of her leaving CAIR.  Ms. Saroya agrees to take down any and all public comments, posts, stories, writings, digital content, and all other information about CAIR that were published on social media and all other mediums, whether published in her name, anonymously, or under a pseudonym, that cast CAIR and/or its subsidiaries, affiliates, and present and former employees, officers and directors and present and former affiliate employees, officers and directors in a negative light, including, but not limited to posts, comments, stories, groups, and/or pages on Facebook, Twitter or Instagram, or any other similar content or medium.  Ms. Saroya shall also delete the Facebook groups launched with the titles "CAIR Sexism Project," "CAIRLESSNESS," the Google Docs "Evaluation Committee," the Instagram group @CSDocuProject, and the email account muslimsdocumenting@gmail.com.   Such statements and content necessarily include, but are not limited to, the statements attached as **Exhibit A**.  Ms. Saroya shall also formally retract all statements made about CAIR and/or its subsidiaries, affiliates, and present and former employees, officers, directors and affiliate employees, by publishing to her Facebook, Twitter, and Instagram, which shall not be subsequently deleted.  The retraction shall be approved by CAIR and incorporated into this Agreement prior to publishing.  This does not preclude Ms. Saroya from making general statements about CAIR's positions on national events.

(*See* **Exhibit 3**.)

50.     Unwilling to be silenced and to have the growing number of former

CAIR employees and volunteers around the country be silenced by CAIR, Ms.

Saroya continued to express her views about the discriminatory, abusive and dishonest conduct at CAIR's highest levels.

## CAIR Attempts To Silence Ms. Saroya With A Baseless Lawsuit Filed In This Court

51.     On May 21, 2021, shortly after the NPR report about CAIR's Executive Director in Florida and evidence of complicity by the national office on April 15, 2021, CAIR filed a 130-page Complaint in the CAIR Action accusing Ms. Saroya of (1) defamation; (2) defamation per se; (3) tortious interference with business relationships; and (4) misappropriation of confidential information. *See CAIR Foundation, Inc., et al. v. Saroya*, Case No. 0:21-cv-01267-SRN-TNL (D. Minn.).

52.     Through the CAIR Action, CAIR not only sought purported damages, but it further sought to silence Ms. Saroya through requesting an injunction so broad that it was tantamount to a preliminary restraint which would have prevented her from speaking about her experience with CAIR.

53.     The obvious purpose for CAIR's lawsuit was to retaliate against Ms. Saroya for expressing her constitutionally protected views about CAIR, and to intimidate her and others who have had the courage to speak out about CAIR's activities into silence.  This was consistent with CAIR's past use of threats and lawsuits to silence whom it views as detractors.  CAIR hoped to stop Muslims and others who had devoted themselves to civil rights from speaking out about CAIR, and to keep women's rights and civil rights organizations from doing the same, all

-18-

while shutting down journalists who may be interested in exposing CAIR from doing so.

54.     But Ms. Saroya would not go away without a fight simply because CAIR commenced a baseless lawsuit.  For her, it was a matter of principle.  She refused to be bullied into submission simply for exposing information relating to her former employer's discrimination, harassment, retaliation, financial mismanagement and other misconduct, all of which was true.

55.     As an individual who has committed her career to nonprofit work, CAIR did not expect Ms. Saroya to be able to afford to defend herself from its malicious attack.   However, Ms. Saroya retained counsel with a history of advocating on civil rights issues in her community, who began vigorously defending her against CAIR's allegations by seeking to demonstrate that all of Ms. Saroya's statements about CAIR were, in fact, true and therefore not defamatory.

56.     Specifically, Ms. Saroya sought discovery regarding CAIR's extensive history of engaging in religious and gender discrimination, sexual misconduct and harassment, and retaliation within the national organization and its local chapters.  On information and belief, this information would have proven the truth of Ms. Saroya's statement that CAIR discriminates against and mistreats its employees, which was one of the statements that CAIR claimed was defamatory.

57.     Further, Ms. Saroya sought discovery of CAIR's donor lists.  On information and belief, this information would have revealed the truth of Ms. Saroya's claims that CAIR received foreign financing and that CAIR was

-19-

financially mismanaged, which were two other statements that CAIR claimed were defamatory.

58.     Despite the fact that this information was directly relevant to showing the truth or falsity of Ms. Saroya's statements about CAIR, and the lack of any responsive documents would arguably have supported many of CAIR's allegations if they had any merit, CAIR fought tooth and nail to prevent this information from being disclosed.  Clearly, CAIR had something to hide, given that it objected to producing many of these relevant documents outright, and slow-walked the production of other documents that it had previously indicated it would produce.

59.     As a result, Ms. Saroya filed two Motions to Compel the production of documents and answers to interrogatories, which were briefed by the parties and argued before the Court via Zoom on November 4, 2021 and December 7, 2021. *See* Docket Entry Nos. 58, 80.   The presiding Judge took the matters under advisement.

60.     While awaiting production of the documents and answers to interrogatories which, on information and belief, would have conclusively proven the truth of her statements about CAIR and shown CAIR's allegations to be meritless, Ms. Saroya also challenged the legal sufficiency of CAIR's Complaint against her by filing a Motion for Partial Judgment on the Pleadings, noting that many of CAIR's claims failed as a matter of law for various reasons.  *See* Docket Entry Nos. 27-31.  By way of limited example, Ms. Saroya argued that CAIR's defamation claims should be dismissed because they were outside the statute of

-20-

limitations, because they were based on non-actionable statements of opinion or hyperbole, and/or because CAIR failed to specifically identify the alleged defamatory statements, as required by Minnesota law.

61.     The parties argued Ms. Saroya's Motion for Partial Judgment on the Pleadings before the Court via Zoom on December 13, 2021.  During the hearing, the presiding Judge raised concerns about the legal sufficiency of some allegations in CAIR's Complaint.

62.     Specifically, Judge Susan Richard Nelson interrupted CAIR's attorneys during their oral argument and stated, " . . . I appreciate that a complaint can certainly create context and tell a story and your complaint does that, but it's very hard to sort out what is actionable and what's not.  It's not at all hard to see what you believe is defamatory, but what is actionable and not actionable is not clear at all from the face of the complaint."  (*See* **Exhibit 1** (Hearing Transcript at 23).)

63.     Judge Nelson also stated that she "would like to see precisely what you believe is verifiable.  Not opinion.  And there's so much of that in your complaint.  So much general unrest and opinion." (*Id.* at 24.)  Finally, Judge Nelson noted, "Much of it is outside of the statute [of limitations]." (*Id.* at 25.)

64.     As a result of the many deficiencies with CAIR's Complaint against Ms. Saroya, Judge Nelson denied the Motion for Partial Judgment on the Pleadings without prejudice, but ordered CAIR to file a narrowed amended complaint within in two weeks.  Specifically, Judge Nelson ruled from the bench:

-21-

I am going to rule from the bench that the motion is denied without prejudice and that the plaintiff is permitted to amend -- I know it's the holidays but we do have to move this ahead. So I'm going to ask you to do that promptly. I'll give you two weeks to do that.

And I want there to be a lot of -- I want to see a lot of discipline in that because the -- a lot of these complaints, although they may be valid, they may be defamatory, they are not actionable. I mean, we really have to get down to what's actionable and what's clear.

This is especially true of the statute of limitations. There will be an opportunity to provide the jury with context, but there can't be any confusion that statements made outside of the statute are somehow actionable. So I want to see a lot of discipline to this amendment; and once that's done, I invite the defense to make a decision about what you chose to do next. I think that's the best way to move ahead here.

(*Id.* at 30.)

65.    With two discovery motions pending that may well have forced CAIR to disclose documents and information that could prove the truth of Ms. Saroya's statements that CAIR claimed were defamatory, and an order from the Court that CAIR significantly narrow its allegations against Ms. Saroya, CAIR effectively admitted defeat and decided to voluntarily dismiss its action against Ms. Saroya in its entirety with prejudice, meaning that CAIR could not raise its allegations against Ms. Saroya again.

66.    This Court dismissed the CAIR Action, with prejudice, on January 11, 2022. *See* Docket Entry No. 88.

### Unable To Silence Ms. Saroya Through Its Lawsuit, CAIR Embarks On A Campaign To Defame Her In An Effort To Discredit And Punish Her

67.    Because CAIR knew full well that Ms. Saroya was well-respected in the Muslim and civil rights communities, and further knowing that its claims had

been dismissed with prejudice, CAIR needed another means of trying to discredit her in the broader community and obfuscate what this Court had said about the non-actionable nature of CAIR's prior claims against Ms. Saroya.  As a result, it elected to defame her by falsely accusing her of crimes, intended to cause her maximum damage to her reputation and emotional well-being.

68.     Approximately one week after the CAIR Action against Ms. Saroya was dismissed in its entirety with prejudice, CAIR published a malicious, false, and defamatory press release about Ms. Saroya on its website, titled *Community Update on Cyberstalking by Lori Saroya, Ex-Staffer* (the "Press Release") on January 20, 2022.  A true and correct copy of that Press Release is attached hereto as **Exhibit 4**. At that time, Ms. Saroya was a private figure.

69.     In the Press Release, CAIR falsely accused Ms. Saroya of violating both state and federal criminal laws by engaging in "cyberstalking."

70.     Cyberstalking is a federal crime pursuant to 18 U.S.C. § 2261A, which provides:

> Whoever—
>
> * * *
>
> (2) with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, uses the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce to engage in a course of conduct that—
>
> (A) places that person in reasonable fear of the death of or serious bodily injury to a person, a pet, a service animal, an emotional

support animal, or a horse described in clause (i), (ii), (iii), or (iv) of paragraph (1)(A); or

(B) causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person described in clause (i), (ii), or (iii) of paragraph (1)(A),

shall be punished as provided in section 2261(b) or section 2261B, as the case may be.

71.    Cyberstalking is also a felony under Minnesota law, pursuant to Minn.

Stat. § 609.749, which provides:

Subd. 5. **Stalking.** (a) A person who engages in stalking with respect to a single victim or one or more members of a single household which the actor knows or has reason to know would cause the victim under the circumstances to feel terrorized or to fear bodily harm and which does cause this reaction on the part of the victim, is guilty of a felony and may be sentenced to imprisonment for not more than ten years or to payment of a fine of not more than $20,000, or both.

(b) For purposes of this subdivision, "stalking" means two or more acts within a five-year period that violate or attempt to violate the provisions of any of the following or a similar law of another state, the United States, the District of Columbia, tribe, or United States territories:

(1) this section; . . .

(10) section 609.79 (obscene or harassing telephone calls);

(11) section 609.795 (letter, telegram, or package; opening; harassment) . . . .[2]

---

[2] When defining harassment, Minn. Stat. § 609.795 provides in part: "(3) with the intent to harass or intimidate another person, repeatedly mails or delivers or causes the delivery by any means, including electronically, of letters, telegrams, or packages and thereby places the other person in reasonable fear of substantial bodily harm; places the person in reasonable fear that the person's family or

-24-

72.     In three separate instances, CAIR asserted that Ms. Saroya had engaged in cyberstalking, which was defamatory per se because it accused her of criminal conduct.  The first instance was in the title of the Press Release itself – i.e., *Community Update on Cyberstalking by Lori Saroya, Ex-Staffer*.  (*See* **Exhibit 4**.)

73.     In the second instance, CAIR wrote:

> As some of you know, a former CAIR national staffer has spent the past several years **using anonymous email accounts and social media profiles to cyberstalk**, smear and undermine our national office, local chapters, volunteers and community partners with help from anti-Muslim extremists.  That former CAIR staffer is Lori Haidri Saroya.

(*Id.* (emphasis added).)

74.     In the third instance, CAIR wrote:

> After enduring **this obsessive and destructive cyberstalking for years**, we decided to file a defamation lawsuit against Lori in 2021 to expose the truth and protect our team in a court of law, where the truth matters.

(*Id.* (emphasis added).)

75.     CAIR's assertions that Ms. Saroya engaged in cyberstalking are statements of fact that were verifiably false.  Ms. Saroya never engaged in the act of cyberstalking, as CAIR well knew when it published the statements.

76.     CAIR made those false assertions with Constitutional Malice in that it knew they were false or, at the very least, acted with reckless disregard of whether

---

household members will be subject to substantial bodily harm; or causes or would reasonably be expected to cause substantial emotional distress . . . ."

they were false.  Indeed, CAIR knew: (i) Ms. Saroya had not violated any criminal statute, much less the state and federal cyberstalking statutes; (ii) that it had never made any complaint to any state or federal law enforcement agency contending that Ms. Saroya had engaged in any "cyberstalking"; and (iii) Ms. Saroya had never been investigated by any entity or charged with "cyberstalking."  CAIR also knew that its characterizations of this Court's rulings were materially false as well.  For example, it knew precisely what Judge Nelson had said about CAIR's claims being non-actionable.  It knew that Ms. Saroya's motion to dismiss was denied, without prejudice, and subject to renewal after CAIR complied with the Court's direction to file a focused and disciplined amended complaint that alleged actual conduct. Tellingly, it chose not to comply with the Court's rulings, including failing to assert any claims for purported "cyberstalking."

77.     CAIR made the assertions that Ms. Saroya had engaged in cyberstalking for the express purpose of damaging Ms. Saroya's reputation and lowering her in the estimation of the community.

78.     The Press Release also falsely conveyed that CAIR had been victorious in the CAIR Action, in order to mislead the public and obfuscate this Court's clear rulings that prompted CAIR to dismiss its own lawsuit, writing that "Lori was not able to defeat our lawsuit.  A few weeks ago, the judge overseeing the case ruled in our favor and denied Lori's motion to dismiss our lawsuit."  (*Id.*)

79. As evidenced by the hearing transcript attached hereto, Judge Nelson plainly did not rule in CAIR's favor, instead pointing out the many legal deficiencies with its Complaint against Ms. Saroya and ordering CAIR to file a new complaint.

80. In the Press Release, CAIR also falsely claimed that the CAIR Action "had already allowed us to prove her [Ms. Saroya's] conduct . . . ." (*Id.*)  To the contrary, CAIR continually refused to produce documents and answer interrogatories in the CAIR Action that would have proven Ms. Saroya's statements about CAIR to be true.

81. In the Press Release, CAIR falsely stated that Ms. Saroya "isn't trying to fix a problem within CAIR" and ". . . the only formal action Lori ever filed against CAIR in all these years was a complaint to a DC employment agency claiming that we had been withholding reimbursements due to her."  To the contrary, as CAIR well knew, on March 7, 2019, Ms. Saroya filed a timely complaint of discrimination alleging a hostile work environment, sexual harassment, retaliation, and disparate treatment (constructive discharge) with the District of Columbia Office of Human Rights.  That complaint is still pending.

82. Like the allegations of cyberstalking, these statements, too, are statements of fact that were false, made with knowledge that they were false or reckless disregard as to their truth or falsity, and communicated to third parties for the purpose of harming Ms. Saroya's reputation and lowering her in the estimation of the community.

-27-

83.     Ms. Saroya's attorneys were not spared CAIR's ire in the Press Release.  CAIR falsely referred to two of Ms. Saroya's attorneys as "Islamophobic" (presumably because of their Jewish names) and falsely stated: ". . . the litigation has already allowed us to prove her conduct: working with Islamophobes . . . ."

84.     As CAIR knows, Ms. Saroya is a devout Muslim and does not work with Islamophobes.  Ms. Saroya has been forced to retain several attorneys over the years to counter CAIR's ongoing attempts to silence and intimidate her.  In fact, her first attorney served on the advisory board of his local CAIR chapter.

85.     As with its efforts to silence victims, this is another page out of CAIR's playbook—whenever a victim hires an attorney to defend herself, accuse that attorney of being "Islamophobic" or "anti-Muslim" in the hopes that it will deflect from the conduct in which CAIR engaged.

86.     On information and belief, the Press Release was emailed and thereby published to CAIR's entire listserv, which contains thousands of email addresses and multitudes of Ms. Saroya's former colleagues, members of the media, and public officials, among others.

87.     The Press Release was also published on CAIR's website at https://www.cair.com/press_releases/community-update-on-cyberstalking-by-lori-saroya-ex-staffer/, where, on information and belief, thousands of individuals across the country have viewed it.  As of the date of this filing, the Press Release is still live and available on CAIR's website, where, on information and belief, it continues to receive views from individuals across the county.

-28-

**CAIR's False And Defamatory Statements Had The Intended Effect Of Damaging Ms. Saroya's Reputation And Causing Her Emotional Distress**

88.     As intended by CAIR, its false and defamatory statements significantly damaged Ms. Saroya's reputation and caused her emotional distress. By way of limited example, as a result of CAIR's Press Release, Ms. Saroya became the subject of online harassment and bullying by individuals who used the CAIR Press Release in their online attacks.  These online attacks became so pervasive that Ms. Saroya had concerns over her physical safety.

89.     Ms. Saroya also stopped attending her mosque because Minnesota Muslims who had read CAIR's Press Release started treating her with hostility and making her uncomfortable in the very mosque that she had attended for years.

90.     Further, Ms. Saroya went on several job interviews during which she was asked specifically about CAIR's Press Release.  Ms. Saroya was not offered any job with any employer who raised CAIR's Press Release.

91.     Due to her commitment to civic engagement and improving her community, Ms. Saroya announced on April 9, 2022 that she was running for city council of Blaine, Minnesota.  Thereafter, her political opponent and his supporters, as well as voters in the town, used the CAIR Press Release to attack her and question her suitability for public office based on CAIR's false assertion that she had engaged

51606110.4

in cyberstalking, and the false assertions that CAIR's Press Release naturally triggered, including that she had been charged with cyberstalking.

92.     As a result of CAIR's conduct, including its false and defamatory Press Release about Ms. Saroya, she has experienced extremely serious emotional distress, which resulted, among other things, in the requirement that she seek medical treatment.

93.     Moreover, the trauma and stress induced by CAIR and its Press Release have led to physical manifestations of emotional distress that include ongoing dizziness, headaches, restlessness, constant worrying, and recurring nightmares.

94.     As a result of CAIR's conduct, Ms. Saroya has been harmed and is entitled to damages for CAIR's wrongful injury to her reputation and for severe emotional distress.

95.     Furthermore, CAIR repeatedly alleged in the Press Release, *including in the title*, that Ms. Saroya engaged in cyberstalking.  Cyberstalking is a federal crime and a felony in the State of Minnesota.

96.     False allegations of having committed a crime constitute defamation per se.  When a statement constitutes defamation per se, there is no need to prove damages, which are presumed.

97.     CAIR's victimization of Ms. Saroya, through defamation, among other things, constitutes extreme and outrageous conduct.  CAIR's conduct passes the boundaries of decency and is intolerable to the civilized community, as

-30-

demonstrated by the fact that there are laws prohibiting prohibit the type of defamatory and otherwise wrongful conduct CAIR engaged in, including when it posted the Press Release.

98.     CAIR engaged in this conduct with the knowledge that it would cause Ms. Saroya emotional distress, or at the very least with a reckless disregard of whether it would cause Ms. Saroya emotional distress.

99.     Ms. Saroya is now entitled to compensation for CAIR's misconduct, and to an injunction forcing CAIR to retract the Press Release and remove it from any publicly-available space.

## COUNT I
## DEFAMATION

100.     Ms. Saroya incorporates Paragraphs 1 through 99 of the Complaint as if fully set forth herein.

101.     CAIR made numerous false statements in the Press Release, including allegations that Ms. Saroya engaged in cyberstalking, which is a crime, that the Court ruled in CAIR's favor on Ms. Saroya's motion to dismiss, and that CAIR had been able to prove Ms. Saroya's conduct in the CAIR Action.

102.     CAIR knew that these statements in the Press Release were false and/or acted with reckless disregard as to their truth or falsity.

103.     CAIR communicated the Press Release to numerous third parties by means of publicly posting it on the internet and, on information and belief, circulating it to the CAIR listserv.

51606110.4

104. Given the content and context of the Press Release, recipients of the false statements therein would have reasonably understood the statements to have related to Ms. Saroya and would further have understood the statements to be statements of fact, not opinion, vituperation, abuse or rhetorical hyperbole.

105. None of the false statements in the Press Release were in any way privileged.

106. Cyberstalking is a crime, and in falsely accusing Ms. Saroya of having engaged in cyberstalking, CAIR falsely accused her of having engaged in a criminal act. False allegations of criminal acts are defamatory per se, obviating the need for Ms. Saroya to plead or prove damages as a result of CAIR's conduct.

107. Regardless, the statements contained in the Press Release tended to harm and lower, and were in fact the direct and proximate cause of harm to, Ms. Saroya's reputation in the community.

108. The false statements contained in the Press Release were also a direct and proximate cause of Ms. Saroya's severe emotional distress.

109. As a result of CAIR's defamatory conduct, Ms. Saroya is entitled to compensatory and consequential damages in an amount in excess of $75,000 to be proved at trial, including without limitation lost profits and damages to compensate Ms. Saroya for her emotional distress and reputational harm, and is further entitled to injunctive relief ordering that CAIR rescind and remove any public reference to the Press Release or any other false material that CAIR has published or otherwise made publicly available relating to Ms. Saroya.

-32-

## COUNT II
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

110.   Ms. Saroya incorporates Paragraphs 1 through 109 of the Complaint as if fully set forth herein.

111.   CAIR's defamatory statements and conduct relating to Ms. Saroya constitute extreme and outrageous behavior.

112.   CAIR's conduct passes the boundaries of decency and is utterly intolerable to the civilized community, as demonstrated by the laws in place that exist to prevent the type of behavior CAIR has engaged in here.

113.   CAIR's conduct was intentional and/or reckless.

114.   CAIR's conduct has caused Ms. Saroya severe emotional distress, as demonstrated by the fact that it forced her to mental health treatment, and caused her to experience ongoing dizziness, headaches, restlessness, constant worrying, and recurring nightmares.

115.   That emotional distress has been severe, and no reasonable person could be expected to endure it.

116.   As a direct and proximate result of CAIR's intentional infliction of emotional distress, Ms. Saroya has been harmed and is entitled to compensatory and consequential damages in an amount in excess of $75,000 to be proved at trial, including without limitation lost profits and damages to compensate Ms. Saroya for her emotional distress and reputational harm, and is further entitled to injunctive relief ordering that CAIR rescind and remove any public reference to the Press

-33-

Release or to any other false material that CAIR has published or otherwise made publicly available relating to Ms. Saroya.

## JURY DEMAND

Ms. Saroya demands a jury trial on any and all claims or issues in this matter so triable pursuant to Federal Rule of Civil Procedure 38 and the Seventh Amendment to the United States Constitution.

## PRAYER FOR RELIEF

**WHEREFORE**, Lori Saroya respectfully prays that the Court grant the following relief:

1.      Enter judgment for Ms. Saroya and against CAIR on all counts;

2.      Award Ms. Saroya all compensatory and consequential damages, including without limitation damages to compensate Ms. Saroya for her emotional distress and reputational harm, in an amount in excess of $75,000;

3.      Order that CAIR remove or otherwise withdraw any defamatory material that it has published or otherwise made publicly available relating to Ms. Saroya;

4.      Award Ms. Saroya her reasonable attorneys' fees and costs, and pre- and post-judgment interest, as allowed by law; and

5.      Award such other and further relief as the Court deems just and equitable.

51606110.4

Dated: January 16, 2024

**SAUL EWING LLP**

By    *s/ Steven C. Kerbaugh*
     Steven C. Kerbaugh (MN #0390429)
     33 South Sixth Street, Suite 4750
     Minneapolis, MN 55402
     Telephone: (612) 225-2946
     Facsimile: (612) 677-3844
     Email:  skerbaugh@saul.com

*Attorneys for Defendant Lori Saroya*