## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Lori Saroya,

        Plaintiff,

v.

CAIR Foundation, Inc. d/b/a Council on
American-Islamic Relations & CAIR,

        Defendant.

Case No.: 24-cv-110 (DWF/DTS)

**PLAINTIFF LORI SAROYA'S
MEMORANDUM IN SUPPORT
OF MOTION TO COMPEL**

## INTRODUCTION

Defendant CAIR Foundation Inc. ("CAIR") purposefully created, published and widely disseminated a defamatory press release about Plaintiff Lori Saroya ("Saroya") in January 2022 (the "Press Release") for the purpose of destroying her reputation and her credibility with respect to the public statements she and others had made about CAIR's record of sexual harassment and discrimination, retaliation against claimants, and other misconduct. The Press Release claimed that Saroya had committed the crimes of cyberstalking and harassment, while also claiming that CAIR had proven that Saroya had made false and defamatory statements about it in a prior lawsuit between the parties titled *CAIR Foundation Inc. v. Lori Saroya*, Civil Action No. 0:21-cv-01267 (D. Minn.) (the "2021 Litigation"). This case is centered around whether CAIR's assertions are false and defamatory. Yet, CAIR has engaged in a complete stonewalling of discovery that has been

pending for close to three (3) months and that goes to the heart of the truth or falsity of CAIR's assertions.

In the prior lawsuit, CAIR alleged that Saroya defamed it and interfered with its business relations by making what it claimed are "false," defamatory statements about it. The supposedly "false" statements made by Saroya—about CAIR's history of engaging in gender and religious discrimination both in its national office and in its chapters, its history of fostering and indulging retaliation and sexual harassment both in its national office and in its chapters, its longstanding practice of soliciting foreign funding and then concealing that foreign funding and lying about it, and its use of donor funds to suppress, silence and intimidate its employees and those who work directly for its chapters, including by coercing the executing of agreements to stay silent about misconduct in exchange for payment—are now directly at issue in this current litigation.

In this litigation, Saroya served document requests and interrogatories on CAIR close to three months ago, on May 7, 2024. In response, CAIR has objected to virtually every interrogatory, failed to produce a single document in this case, and refused to even commit to when it would produce the paltry amount of information it has agreed to produce. CAIR's outright obstruction of discovery that goes to the heart of Saroya's claims should not be tolerated. As discussed below, the Court should grant Saroya's motion in its entirety and compel CAIR to produce documents and information responsive to Request Nos. 1-4, 8, 10-16, 18-25 and 32-41 and Interrogatory Nos. 4 and 10-19.[1]

_____

[1] With respect to the remaining discovery requests, despite purportedly "agreeing" over 40 days ago to produce responsive documents and substantive interrogatory answers, CAIR

Specifically, CAIR has refused to produce discovery that goes to the heart of the central issue in this case – the truth or falsity of CAIR's criminal allegations that Saroya is a "cyberstalker" who "harass[ed]" the organization and its supporters.  To determine whether CAIR truthfully stated that Saroya committed those crimes, which may be protected speech, or falsely and defamatorily accused Saroya of those crimes, which would be actionable, the Court must analyze the statements that Saroya made about CAIR, which were the subject of the prior litigation.  If Saroya was speaking truthfully about matters of public concern with no intent to harm others, she cannot have committed a crime, under longstanding First Amendment jurisprudence.  *See Garrison v. State of La.*, 379 U.S. 64, 74 (1964) ("Truth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned.") (emphasis added); *see also Counterman v. Colorado*, 600 U.S. 66, 76 (2023) (overturning internet stalking conviction – "The First Amendment precludes punishment, whether civil or criminal, unless the speaker's words were 'intended' (not just likely) to produce imminent disorder."); *Grimmett v. Freeman*, 59 F.4th 689, 692 (4th Cir. 2023) (striking down criminal statute that prohibited making a "derogatory report" about candidate with reckless disregard of falsity – "[W]e conclude the Act likely criminalizes at least some truthful speech—a step the Constitution forbids."); *Matter of Welfare of A.J.B.*, 929 N.W.2d 840, 853 (Minn. 2019) (striking down stalking-by-mail criminal statute because it criminalized conduct at "the core of protected First

_____

has completely failed to do so.  Similarly, it has failed to commit itself to a date certain when it will actually comply with its discovery obligations.

Amendment speech").  Accordingly, discovery relating to the truth of Saroya's prior statements is directly relevant to the falsity of CAIR's allegations that Saroya engaged in cyberstalking, harassment and other defamatory conduct.  It also is directly relevant to CAIR's motives in issuing the Press Release, which was to discredit and harm Saroya.  As such, Saroya is entitled to the production of responsive documents and substantive answers to interrogatories which form the basis of her discovery requests, such that her Motion to Compel should be granted.

## **BACKGROUND**

## I.   **CAIR COMMENCES A DEFAMATION ACTION AGAINST SAROYA**

On May 21, 2021, CAIR commenced the 2021 Litigation.  (*See* Decl. of Steven C. Kerbaugh dated July 26, 2024 ("Kerbaugh Decl.") Ex. 1.)  Although CAIR purported to state a few causes of action, its action was primarily one for defamation.  (*See id.* Ex. 1 ¶¶ 166-87, 190-91, 203.)[2]  All of CAIR's claims had at their core that Saroya made certain online posts that CAIR maintained were not true.  (*See, generally*, *id.* Ex. 1.)  Among the statements that CAIR claimed were actionable were the following:

- statements relating to gender and religious discrimination, sexual harassment, hostile work environment and retaliation within CAIR (*see, e.g.*, *id.* Ex. 1 ¶ 79);

- statements relating to CAIR having engaged in union busting (*see, e.g.*, *id.* Ex. 1 ¶ 79);

- statements relating to CAIR's corporate and financial mismanagement (*see, e.g.*, *id.* Ex. 1 ¶¶ 53 (alleging Saroya made statements relating to "criminal and civil misconduct"), 79 (statement relating to "financial mismanagement, lack of board

---

[2] The history of the 2021 Litigation is also set forth in more detail in Saroya's Complaint in this matter.  (*See* Compl. dated Jan. 16, 2024 (ECF No. 1) ("Compl.") ¶¶ 51-66.)

oversight, and board incompetence"), 84 (CAIR "is a very mismanaged, ineffective organization with corrupt leaders."));

- statements relating to CAIR having received foreign funding (*id.* Ex. 1 ¶¶ 119 (alleging that Saroya's accusation that CAIR accepted "international funding through their Washington Trust Foundation" was actionable); *see also id.* Ex. 1 ¶¶ 120-21); and

- statements relating to CAIR using its attorneys to "suppress, silence, and intimidate" its employees and having a pattern of mistreating them. (*Id.* Ex. 1 ¶ 80.)

When CAIR refused to produce documents relating to the truth or falsity of such statements in the initial lawsuit, Saroya was forced to repeatedly move to compel in the 2021 Litigation. (*See, e.g.*, 2021 Litigation Docket, ECF Nos. 37, 55.)

Saroya also filed a motion for partial judgment on the pleadings in the 2021 Litigation, arguing that the claims should be dismissed because, among other things, they were statements of non-actionable opinion. (*See* Compl. ¶ 60, Ex. 1.) During the hearing on the motion, Judge Nelson noted that "what is actionable and not actionable is not clear at all from the face of the complaint." (*Id.* Ex. 1. at 23.) As a result of this and other deficiencies with CAIR's Complaint, Judge Nelson denied the motion for partial judgment on the pleadings without prejudice, but ordered CAIR to file an amended complaint within two weeks. (*Id.* Ex. 1 at 30.) In so ruling, the Court noted in part:

> I am going to rule from the bench that the motion is denied without prejudice and that the plaintiff is permitted to amend -- I know it's the holiday but we do have to move this ahead. So I am going to ask you to do that promptly. I'll give you two weeks to do that.
>
> And I want there to be a lot of -- I want to see a lot of discipline in that because the -- a lot of these complaints, although they may be valid, they may be defamatory, they are not actionable. I mean, we really have to get down to what's actionable and what's clear.

> This is especially true of the statute of limitations. There will be an opportunity to provide the jury with context, but there can't be any confusion that statements made outside of the statute are somehow actionable. So I want to see a lot of discipline to this amendment; and once that's done, I invite the defense to make a decision about what you choose to do next. I think that's the best way to move ahead here.

(*Id.* Ex. 1 at 30.)

With two discovery motions pending that may have forced CAIR to disclose information that could prove the truth of Saroya's statements, and an order from the Court that CAIR narrow its allegations, CAIR voluntarily dismissed its action against Saroya in its entirety with prejudice. (*See* 2021 Litigation Docket, ECF No. 88.) The Court dismissed the CAIR action with prejudice on January 11, 2022. (*Id.*)

## II.     CAIR ISSUES THE DEFAMATORY PRESS RELEASE

Despite having dismissed its lawsuit, CAIR did not cease its efforts to discredit Saroya. (Compl. ¶ 67.) Promptly after the dismissal of the CAIR action, on January 20, 2022, CAIR published a false and defamatory Press Release on its website titled *Community Update on Cyberstalking by Lori Saroya, Ex-Staffer*. (*Id.* ¶ 68, Ex. 4.) In the Press Release, CAIR falsely accused Saroya of "cyberstalking," which is a crime under federal and Minnesota law. (*Id.* ¶¶ 69-77 (citing 18 U.S.C. § 2261A; Minn. Stat. § 609.749).) For example, the Press Release contained allegations that Saroya "spent the past several years using anonymous email accounts and social medial profiles to cyberstalk, smear and undermine our national office, local chapters, volunteers and community partners with help from anti-Muslim extremists." (*Id.* ¶ 73, Ex. 4.) CAIR further alleged, "After enduring this obsessive and destructive cyberstalking for years, we decided to file a

-6-

defamation lawsuit against Lori in 2021 to expose the truth and protect our team in a court of law, where the truth matters." (*Id.* ¶ 74, Ex. 4.)

Similarly, CAIR accused Saroya of harassment. For example, CAIR alleged:

First, the litigation had already allowed us to prove her conduct: working with Islamophobes, sending hundreds of anonymous emails in the middle of the night attacking our civil rights organization, harassing us and our supporters on social media, among many other things.

(*Id.* Ex. 4.) In so alleging, CAIR not only accused Saroya of yet another crime (i.e., harassment), but it also alleged that it had been able to prove Saroya's conduct in the litigation (i.e., that she had engaged in defamation and, thus, that her statements were purportedly false). These allegations are simply false, and indeed, are not only defamatory, but defamatory per se. (*See id.* ¶¶ 78-80, 82.)

## III.   SAROYA'S CLAIMS

CAIR's motive in issuing the Press Release is apparent—it sought to blacken Saroya's reputation, destroy her credibility in the community and silence her and others who have raised concerns about CAIR's misconduct. (*See id.* ¶¶ 1, 77.) And while CAIR cannot succeed in its efforts to keep Saroya from telling the truth about her experiences at CAIR, it has succeeded in causing significant emotional distress and injury to Saroya and her reputation. (*See id.* ¶ 7.) For example, Saroya has been forced to endure online and in-person bullying and harassment, alienation from members of her religious community, and loss of employment opportunities. (*Id.*) As a result, Saroya was forced to bring this action.

Saroya's Complaint states two claims—one for defamation and one for intentional infliction of emotional distress.  (*Id.* ¶¶ 100-116.)  Both of those claims have at their core that CAIR maliciously engaged in defamatory conduct, including making false statements in the Press Release that Saroya engaged in cyberstalking and harassment, and that CAIR was able to prove in the 2021 Litigation that she engaged in defamatory conduct.  (*See id.*)  Saroya now seeks documents and information relating to her claims, which CAIR has thus far denied.

## IV.  PROCEDURAL POSTURE

Saroya served her initial requests for production and interrogatories to CAIR on May 7, 2024.  (Kerbaugh Decl. Exs. 2-3.)  She followed up with a second set of document requests to CAIR served on May 14, 2014.  (*Id.* Ex. 4.)  As discussed *infra*, those requests sought information relating to Saroya's claims that CAIR defamed her when it accused her of cyberstalking, harassment, and having engaged in defamatory conduct by publicly disclosing information relating to CAIR that Saroya knows to be true.  (*Id.* Exs. 2-4.)  CAIR responded by issuing myriad objections, indicating with regard to numerous requests that it would not be producing any documents or information despite its relevance to this action.  (*Id.* Exs. 5-7.)[3]

Counsel for the parties first met and conferred by telephone on June 14, 2024.  (*See id.* Ex. 8.)  They subsequently exchanged correspondence dated June 20 and June 25,

---

[3] Notably, as of the submission of this motion, CAIR has not even produced the documents that it has agreed to produce, despite the discovery requests having been issued close to three months ago.

respectively.  (*Id.* Exs. 8-9.)  During the course of the meet and confer process, Saroya

made numerous offers of compromise, including narrowing the subject matter of certain

requests, narrowing the timing of certain requests, agreeing to treat certain information as

attorneys'-eyes only, and so forth.  (*Id.* Ex. 8.)[4]  Despite this, the parties were unable to

resolve the issues identified in this motion.  Saroya thus now respectfully requests that the

Court grant her motion to compel the production of documents and information responsive

to her Request Nos. 1-4, 8, 10-16, 18-25, 32-41 and Interrogatory Nos. 4 and 10-19 to CAIR.

## SUMMARY OF THE REQUESTS AT ISSUE

Below is a brief summary of the Requests and Interrogatories at issue for the purpose

of this Motion, a summary of their relevance for the purpose of this action, and a summary

of CAIR's objections and position regarding the production of responsive evidence.[5]

## I.  COMMUNICATIONS THAT CAIR HAS HAD RELATING TO SAROYA, THE 2021 LITIGATION AND THE PRESS RELEASE

One category of evidence that Saroya seeks, but which CAIR maintains it should

not be required to produce, involves communications referring to Saroya, the 2021

---

[4] A chart reflecting the at issue discovery requests, the parties' positions relating to those requests, and the parties' offers of compromise will be submitted to the Court at least three business days before the hearing pursuant to the process set forth at page 4 of the Pretrial Scheduling Order dated May 2, 2024 (ECF No. 27).

[5] The full text of the document requests and interrogatories served on CAIR can be found at the Kerbaugh Declaration as Exhibits 2-4, pursuant to District of Minnesota Local Rule 37.1(c).  CAIR's objections to the discovery are quite lengthy.  Given the number of requests at issue and word count considerations, this memorandum does not recite CAIR's objections verbatim, but instead attempts to summarize them for the Court's convenience. The full text of CAIR's responses to Saroya's discovery are attached to the Kerbaugh Declaration as Exhibits 5-7 pursuant to District of Minnesota Local Rule 37.1(c).

Litigation and/or the Press Release from May 11, 2018 to present. Communications with and relating to Saroya are patently relevant for numerous reasons, including without limitation that: (a) they speak to the falsity of CAIR's statements regarding Saroya having engaged in cyberstalking and harassment; (b) they relate to and demonstrate the background of this action and relationship between the parties; (c) they relate to and bear on CAIR's malice and motive in defaming and otherwise acting as it has vis-à-vis Saroya; and (d) they demonstrate the extent to which CAIR has made false statements relating to Saroya, both internally and to third parties. Communications relating to the 2021 Litigation are relevant because CAIR made representations relating to it in the Press Release, including the false representations that it had proved its claims in the action. (*See* Compl. Ex. 4.) And, of course, communications relating to the Press Release are relevant in that the creation and dissemination of that Release is the core of this action and what made it necessary in the first place.

Among the requests that Saroya has issued to CAIR relating to these topics are the following Document Requests:[6]

- No. 1 (documents and communications relating to Saroya);

- No. 2 (documents relating to communications concerning Saroya's employment with CAIR, including her personnel file);

- No. 3 (documents relating to communications concerning Saroya's cofounding of, volunteer efforts for or employment by CAIR-Minnesota, employment by CAIR or appointment to serve on CAIR's Board);

---

[6] Document Request Nos. 1-32 are found at Exhibit 2 to the Kerbaugh Declaration. Request Nos. 33-41 are found at Exhibit No. 4 to the Kerbaugh Declaration. CAIR's responses can be found at Exhibit Nos. 5 and 7 to the Kerbaugh Declaration, respectively.

- No. 4 (documents relating to communications concerning Saroya's resignation from CAIR);

- No. 8 (documents relating to communications concerning the 2021 Litigation);

- No. 10 (documents relating to agendas or minutes of any CAIR Board meeting concerning the 2021 Litigation, the Press Release or Saroya from May 2018 to present);

- No. 11 (documents relating to statements of any member of CAIR's Board concerning the 2021 Litigation, the Press Release or Saroya from May 2018 to present);

- No. 12 (documents relating to statements by named officers of CAIR concerning the 2021 Litigation, the Press Release or Saroya from May 2018 to present);

- No. 13 (documents relating to communications between CAIR and the media concerning the 2021 Litigation, the Press Release or Saroya from May 2018 to present);

- No. 14 (documents relating to communications between CAIR and any CAIR chapter or employee concerning the 2021 Litigation, the Press Release or Saroya from May 2018 to present);

- No. 15 (documents relating to communications between CAIR and any donor concerning the 2021 Litigation, the Press Release or Saroya from May 2018 to present);

- No. 16 (documents relating to communications between CAIR and any public relations or crisis management firm or consultant concerning the 2021 Litigation, the Press Release or Saroya from May 2018 to present);

- No. 18 (documents relating to communications between CAIR and Saroya from May 2018 to the present);

- No. 24 (documents relating to communications to the public CAIR made relating to Saroya or CAIR's assertions that she has engaged in cyberstalking);

- No. 25 (documents relating to statements by CAIR that Saroya was engaged in cyberstalking);

- No. 39 (documents relating to media inquiries about or coverage of the 2021 Litigation, including documents related to the status and/or dismissal of the lawsuit);

Saroya also issued the following Interrogatories relating to CAIR's communications with and/or about Saroya:[7]

- Interrog. No. 4 (identification of every statement by CAIR to any chapters or affiliates, or issued to the media or public, relating to Saroya since January 2018);

- Interrog. No. 12 (identification of every complaint, grievance or claim of any kind against Saroya by any person affiliated with CAIR); and

- Interrog. No. 13 (identification of every document relating to an evaluation of Saroya's job performance with CAIR or its Minnesota chapter).

The purported bases for CAIR's objections to each of these Requests and Interrogatories is that they are overly broad and/or unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case. (Kerbaugh Decl. Ex. 5 at Request Nos. 1-4, 8, 10-16, 18, 24-25; Ex. No. 6 at Interrog. Nos. 4, 12-13; Ex. 7 at Request No. 39.)[8]  In response to CAIR's objections, Saroya offered numerous compromise positions, including: (a) limiting the temporal scope of many of the requests to January 1, 2016 to the present (Request Nos. 1-4, 11-15, 24-25); (b) narrowing requests regarding communications to a certain subset of the individuals who

_____

[7] Saroya's interrogatories to CAIR can be found at Exhibit 3 to the Kerbaugh Declaration, and CAIR's responses can be found at Exhibit 6.

[8] CAIR further objects to certain requests as calling for privileged information.  Saroya has made it clear during the meet and confer process that she is not seeking privileged information.  (*See* Kerbaugh Decl. Ex. 8.)  To the extent that responsive information is privileged, it can be logged to allow Saroya to assess the legitimacy of the privilege claim, although no log has been produced to date.

may have engaged in them (Request Nos. 8, 11-15); (c) agreeing to the redaction of material not relevant to the topics identified in the request (Request No. 10); and agreeing to treat certain responsive information as attorneys'-eyes only (Interrog. No. 4). (*Id.* Ex. 8.) Despite this, CAIR refuses to produce documents and information responsive to the above requests. (*Id.* Ex. 9.)

## II.   INFORMATION PERTAINING TO THE TRUTH OF STATEMENTS THAT CAIR HAS ALLEGED CONSTITUTED "CYBERSTALKING", "HARASSMENT" AND "DEFAMATION" BY SAROYA

As discussed above, Saroya commenced this action because CAIR has falsely and publicly accused her of "cyberstalking" and "harassment," among other things. (Compl. Ex. 4.) But by posting the statements that CAIR claims constitute stalking and harassment, Saroya was simply publicly disclosing the truth about her experiences with CAIR and CAIR's conduct in an effort to educate the public about the organization. Making accurate statements for the public good does not constitute the crime of stalking or harassment. Thus, the truth of the statements that CAIR alleges constitute illegal conduct is relevant to this action. *See Garrison*, 379 U.S. at 74 ("Truth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned.").

Second, the truth of these statements speaks to CAIR's motives in commencing the 2021 Litigation and issuing the Press Release. CAIR's actions were retaliatory and an effort to intimidate Saroya from making truthful statements about CAIR.

Furthermore, CAIR alleged in the Press Release that the Judge in the 2021 Litigation ruled in its favor, and that it was able to prove Saroya's conduct in the lawsuit. The conduct CAIR alleged in that lawsuit was defamation. (*See* Kerbaugh Decl. Ex. 1.) In issuing the

Press Release, then, CAIR was alleging that it was able to prove that the communications which formed a basis for its defamation claim (and those that form the basis for the cyberstalking and harassment allegations) were indeed false. Therefore, again, the truth of those statements is germane to this litigation.

By her Document Requests and Interrogatories, then, Saroya seeks information relating to numerous statements that were at issue in the 2021 Litigation. For example, Saroya seeks documents and information that will demonstrate the truth of statements relating to:

- Gender and religious discrimination, sexual harassment, hostile work environment and retaliation within CAIR. (*See id.* Ex. 1 ¶ 79.)  Discovery requests speaking to this issue include:

    o  Request No. 19 (documents relating to claims, complaints or allegations from CAIR employees of sex or gender discrimination, sexual harassment or retaliation);

    o  Request No. 20 (documents relating to claims, complaints or allegations by employees of chapters or affiliates of CAIR concerning sex or gender discrimination, sexual harassment or retaliation);

    o  Request No. 21 (documents relating to any investigation or factfinding conducted by or on behalf of CAIR related to any claim of sex or gender discrimination, sexual harassment or retaliation);

    o  Request No. 22 (documents relating to any investigation or factfinding of any kind conducted by or on behalf of a CAIR chapter or affiliate related to any claim of sex or gender discrimination, sexual harassment or retaliation);

    o  Request No. 23 (documents relating to allegations of misconduct by CAIR officer Zainab Chaudry);

    o  Request No. 38 (documents relating to allegations of misconduct by CAIR-Florida officer Hassan Shibly);

-14-

- o  Request No. 40 (documents relating to Karen Leslie Hernandez, who asserted claims against CAIR after the termination of her employment);

- o  Request No. 41 (documents relating to Mariam Amer, who alleged that she was pushed out of CAIR's Iowa chapter due to her disability);

- o  Interrog. No. 10 (identification of every employee of CAIR, or a chapter or affiliate, who has asserted that they have been subject to discrimination, harassment or retaliation);

- o  Interrog. No. 11 (description of any investigation conducted by CAIR in response to the assertions at issue in Interrogatory No. 10);

- o  Interrog. No. 15 (description of any investigation conducted by CAIR or on its behalf by an external investigation of allegations of misconduct by any CAIR director or employee since 2011);

- o  Interrog. No. 17 (identification of every lawsuit or administrative claim filed by any individual, entity or agency against CAIR or any of its directors or employees since 2011); and

- o  Interrog. No. 18 (identification of every criminal indictment or information issued against, or guilty plea entered by, any individual who is or was an employee or officer of CAIR since 2011).

- Statements relating to CAIR's corporate and financial mismanagement.  (*See, e.g.*, Kerbaugh Decl. Ex. 1 ¶¶ 53 (alleging Saroya made statements relating to "criminal and civil misconduct"), 79 (statement relating to "financial mismanagement, lack of board oversight, and board incompetence"), 84 (CAIR "is a very mismanaged, ineffective organization with corrupt leaders.").)  Discovery requests speaking to this issue include:

- o  Request No. 35 (documents relating to the exchange, transfer or division of assets between or among CAIR Foundation, CAIR, Inc., CAIR Action Network and the Washington Trust Foundation, including a loan totaling $1 million from CAIR, Inc. to CAIR Foundation disclosed in a Form 1023 filing);

- o  Request No. 36 (documents relating to any version of CAIR's Whistleblower Policy and Document Retention Policy, as required under the Sarbanes-Oxley Act); and

- o Request No. 37 (documents relating to any report, analysis or recommendations provided by any consulting or outside firm relating to CAIR governance or management commissioned or received during the tenure of CAIR Board Chair Parvez Ahmed).

- Statements relating to CAIR having received foreign funding. (*See. e.g.*, Kerbaugh Decl. Ex. 1 ¶¶ 119 (alleging that Saroya's accusation that CAIR accepted "international funding through their Washington Trust Foundation" is actionable), 120-21.) Discovery requests speaking to this issue include:

  - o Request No. 32 (documents demonstrating the names of every contributor to CAIR in an amount over $5,000 for any year from 2014-2022);

  - o Request No. 33 (documents relating to contributions to CAIR, or any affiliate, by any individual or entity within, or any governmental unit of, Saudi Arabia, Qatar or Kuwait between 2007 and 2014); and

  - o Request No. 34 (documents relating to the acquisition by CAIR or an affiliate of property located at 921 2nd St. NE in Washington D.C., including the sources of the funding for the acquisition).

- Statements relating to CAIR using its attorneys to "suppress, silence, and intimidate" its employees and having a pattern of mistreating them. (*See* Kerbaugh Decl. Ex. 1 ¶ 80.) Discovery requests speaking to this issue include:

  - o Interrog. No. 16 (identification of every lawsuit, including defamation suit, that CAIR has filed from 2011 to the present); and

  - o Interrog. No. 19 (identification of every settlement agreement, severance agreement or non-disclosure agreement entered into with any individual by CAIR since 2011).

Again, CAIR broadly objected to these discovery requests. The purported bases for its objections to each of these requests is that it is overly broad and/or unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence,[9] and not

---

[9] As a corollary to its relevance objection, CAIR claims that it should not be forced to produce documents relating to its chapters and national affiliates that are in CAIR's

proportional to the needs of the case.  (*See* Kerbaugh Decl. Ex. 5 at Request Nos. 19-25, 32; Ex. 6 at Interrog. Nos. 10-15, 17-19; Ex. 7 at Request Nos. 33-35, 38, 40-41.)[10]  In response to CAIR's objections, Saroya made numerous offers of compromise, including: (a) narrowing the temporal scope of the requests from January 1, 2016 to January 20, 2022 (i.e., the date of the posting of the Press Release) (Request Nos. 19-25; Interrog. Nos. 13-15); and (b) agreeing to treat certain responsive information as attorneys'-eyes only (Request Nos. 32-35, 38, 40-41; Interrog. Nos. 10-12, 15, 17-19).  (*Id.* Ex. 8.)  Despite this, CAIR has not produced any responsive information.  (*Id.* Ex. 9.)

## III.   INFORMATION PERTAINING TO THE MEANS BY WHICH CAIR MAY HAVE DISSEMINATED DEFAMATORY COMMUNICATIONS RELATING TO SAROYA

Interrogatory No. 14 seeks the identity of every email account, social media account, YouTube account, and Internet address used by CAIR since 2011.  (*Id.* Ex. 3.)  Information responsive to this Interrogatory is likely to lead to discoverable information in that every responsive account is a potential source from which CAIR and/or its agents may have published defamatory matter relating to Saroya.  Despite this, CAIR objected to this Interrogatory as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.  Despite Saroya having agreed to narrow the temporal scope of the Interrogatory to January 1, 2018 to the present, CAIR still refuses to

---

possession, custody or control.  (*See, e.g.*, Kerbaugh Decl. Ex. 6 at Interrog. Nos. 1-2, 10-19; Ex. 7 at Request Nos. 33-35, 40-41.)

[10] CAIR further objects to certain requests as calling for privileged information.  Again, documents responsive to those requests can be logged.

produce responsive information.  (*See id.* Exs. 8-9.)  The Court should compel CAIR to

produce this information, as well as that addressed above.

## ARGUMENT

**I.    THE RULES REQUIRE CAIR TO PRODUCE INFORMATION RELEVANT TO ITS CLAIMS AND SAROYA'S DEFENSES**

Parties are entitled to "obtain discovery regarding any nonprivileged matter that is

relevant to any party's claim or defense . . . ."  Fed. R. Civ. P. 26(b)(1).  Information "need

not be admissible in evidence to be discoverable."  *Id.*  "In the context of discovery,

'relevant' has been defined as encompassing any matter that bears on, or that reasonably

could lead to other matter that could bear on, any issue that is or may be in the case."

*Walker v. Nw. Airlines Corp.*, 2002 WL 32539635, at *1 (D. Minn. Oct. 28, 2002)

(quotation omitted); *see also Hickman v. Taylor*, 329 U.S. 495, 507 (1947) (the rules

provide for "broad and liberal" discovery; "[n]o longer can the time-honored cry of 'fishing

expedition' serve to preclude a party from inquiring into the facts underlying his

opponent's case."); *Kramer v. Boeing Co.*, 126 F.R.D. 690, 692 (D. Minn. 1989) (noting

that relevancy "is a difficult objection upon which to prevail during the discovery phase of

an action.").  Moreover, "[d]iscovery is not to be denied because it relates to a claim or

defense that is being challenged as insufficient."  *LNV Corp. v. Outsource Serv. Mgmt.,*

*LLC*, 2013 WL 12180768, at *3 (D. Minn. Nov. 14, 2013) (quoting 8 Charles Alan Wright,

et al., *Federal Practice and Procedure* § 2008 (2013) (citing cases)).

"The purpose of discovery is to provide a mechanism for making relevant

information available to the litigants.  'Mutual knowledge of all the relevant facts gathered

by both parties is essential to proper litigation.'"  Fed. R. Civ. P. 26, cmt. 1983 Amendment

(quoting *Hickman*, 329 U.S. at 507); *see also Transclean Corp. v. Bridgewood Servs., Inc.*,

101 F. Supp. 2d 788, 797 (D. Minn. 2000) (noting that the purpose of Rule 26 is "to prevent

Trial by ambush").  Courts should give the discovery rules "a broad, liberal interpretation."

*Edgar v. Finley*, 312 F.2d 533, 535 (8th Cir. 1963).  Pursuant to these Rules, Saroya is

entitled to the information she seeks relating to her claims.

## II.    CAIR MUST PRODUCE COMMUNICATIONS THAT IT HAS HAD RELATING TO SAROYA, THE 2021 LITIGATION AND THE PRESS RELEASE

CAIR claims that certain communications with and relating to Saroya are not

relevant to this action.  For several reasons, it is mistaken.  All information relating to

Saroya's requests for communications about Saroya, the 2021 Litigation and the Press

Release bear on issues in this case.  *See Walker*, 2002 WL 32539635, at *1 ("In the context

of discovery, 'relevant' has been defined as encompassing any matter that bears on, or that

reasonably could lead to other matter that could bear on, any issue that is or may be in the

case.").  CAIR should thus produce it.

### A.    Documents Relating to Communications Between Saroya and CAIR, and Relating to Saroya's Work for CAIR, Are Relevant Because They Speak to the Falsity of CAIR's Allegations of Cyberstalking and Harassment

In the Press Release, CAIR accuses Saroya of having engaged in cyberstalking and

having "harassed us."  Stalking and harassment are broadly understood as crimes with well-

defined meanings.  For example, federal law provides that it is a crime to:

> with the intent to kill, injure, harass, intimidate, or place under surveillance
> with intent to kill, injure, harass, or intimidate another person, use[] the mail,

any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce to engage in a course of conduct that:

> (A) places that person in a reasonable fear of death of or serious bodily injury to a person . . . or

> (B) causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person . . . .

18 U.S.C. § 2261A (Stalking).  Similarly, Minnesota law provides:

> (a) A person who engages in stalking with respect to a single victim or one or more members of a single household which the actor knows or has reason to know would cause the victim under the circumstances to feel terrorized or to fear bodily harm and which does cause this reaction on the part of the victim, is guilty of a felony . . . .

> (b) For the purposes of this subdivision, "stalking" means two or more acts within a five-year period that violate or attempt to violate the provisions of any of the following or a similar law of another state, the United States, the District of Columbia, tribe, or United States territories: . . .

>> (10) section 609.79 (obscene or harassing telephone calls);

>> (11) section 609.79 (letter, telegram, or package; opening; harassment) . . . .

Minn. Stat. § 609.749, subdiv. 5 (Harassment; Stalking; Penalties).  Saroya alleges that CAIR's statements that she engaged in such conduct are defamatory per se.  (*See* Compl. ¶¶ 100-09.)

Of course, the sine qua non of a defamation claim is falsity. *Keuchle v. Life's Companion P.C.A., Inc.*, 653 N.W.2d 214, 218 (Minn. Ct. App. 2008) (the first element of defamation is "that the statement was false").  Here, the discovery sought speaks directly to the truth or falsity of CAIR's allegations that Saroya engaged in cyberstalking and

-20-

harassment. Saroya's communications with CAIR, and CAIR's communications with and about Saroya, will demonstrate that at no point did Saroya say anything intended to cause anyone to feel terrorized or in fear of bodily harm, nor did anyone at CAIR actually reasonably fear or suffer harm as a result of Saroya's statements.

Moreover, context is important in determining whether an individual engaged in stalking or harassment. *See State v. Franks*, 765 N.W.2d 68, 75 (Minn. 2009) (noting in the context of the harassment statute, "it is proper to view a defendant's words and acts in the context of the defendant's relationship with the victim"); *State v. Hendriksen*, 522 N.W.2d 928, 929 (Minn. 1994) ("Evidence bearing on the defendant's relationship with the victim . . . is often admitted in terroristic threats and domestic abuse cases" since it "puts the alleged conduct of the defendant in context, may help the jury in assessing the defendant's intent and motivation"); *State v. McReynolds*, 2021 WL 669027, at *2 (Minn. Ct. App. Feb. 22, 2021) (noting that to determine whether an individual had reason to know that conduct would cause the victim to feel terrorized or fear bodily harm "requires a consideration of the existing conditions and the context of the act.") (quotation omitted). Documents and information relating to the relationship between the parties is thus relevant because it provides helpful context in establishing Saroya's legitimate motives in making the statements she did.

### B. The Discovery Sought Speaks to the Background Relationship Between the Parties and Provides Necessary Context for CAIR's Defamatory Statements

Information bearing on the relationship between the parties is also critical to demonstrating CAIR's motive, state of mind, purpose, and strategy when deliberately

publishing the defamatory statements about Saroya in the Press Release, and, indeed, CAIR's very design in publishing these defamatory statements. The context, timing, and nature of CAIR's defamatory statements, the very reason that they were made in the first place, what it was that CAIR sought to achieve by making them, its motivation in saying what it said, how it said it, and to whom, are facts that are directly relevant and admissible to both Saroya's claims and CAIR's apparent defenses. Here, Saroya is entitled to show, including through the evidence CAIR seeks to withhold, that the entire purpose of the statements it has been making about her is to retaliate against her for raising public concern about CAIR's misconduct, to intimidate her (and others who have expressed the same concerns), and to destroy the credibility of Saroya and others, so that their public statements will be disregarded.

CAIR's state of mind, motive, purpose, and intent when making the statements about Saroya in the Press Release, including the relationship between the parties, and the very issues that have been front and center in these two interrelated pieces of litigation, is necessary and relevant to determine whether the statements were published negligently, and indeed, recklessly and intentionally. *See, e.g.*, *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 258 (Minn. 1980) (analyzing hostile encounters between the plaintiff and the defendant prior to the defamatory conduct in the context of determining whether it was reasonable for the jury to have determined the presence of malice). Discovery relating to the relationship between the parties provides necessary context for CAIR's misconduct.

### C.      The Discovery Sought Speaks to CAIR's Malice

CAIR contends in its Answer that its statements were privileged.  (Answer dated

Mar. 14, 2024 (ECF No. 23) at Affirmative Defense 4.)  Privilege may be overcome if the

plaintiff shows that the statement was made with malice.  *See id.*  Malice under the common

law means that the defendant made the statement from ill will and improper motives, or

causelessly and wantonly for the purpose of injuring the plaintiff.  *See Mudrich v. Wal-*

*Mart Stores, Inc.*, 955 F. Supp. 2d 1001, 1029-30 (D. Minn. 2013) (noting that actions

external to the defamatory language itself, including prior comments that the defendant

was "out to get her," are relevant to determining whether a defendant's motives are

malicious and can overcome qualified privilege).  "Malice may be proved by evidence that

the defendant knew that the statements were false or by extrinsic evidence of personal ill

feeling, or by intrinsic evidence such as the exaggerated language of the libel, the character

of the language used, the mode and extent of publication, and other matters in excess of

the privilege." *Id.* at 1029 (quotation omitted).  Of course, documents and information

speaking to the history and relationship between the parties bear directly on the extent of

CAIR's ill will and potential motives in seeking to harm Saroya.  Communications relating

to Saroya, the 2021 Litigation and the Press Release are relevant for this reason as well.

### D.      The Discovery Sought Will Demonstrate the Extent to Which CAIR Has Made False Statements Relating to Saroya

Finally, Saroya fully suspects that CAIR's efforts to shield itself from discovery

relating to its communications about Saroya and the 2021 Litigation are intended to prevent

Saroya from discovering additional instances of defamatory statements.  At this point,

Saroya knows about the Press Release, but she cannot be sure of whether CAIR and its agents have made additional false statements, or how many such statements were made, to whom, and so forth. Saroya is entitled to discovery relating to communications that CAIR has had on the at issue topics so that she can fully discover the extent of CAIR's misconduct.

In sum, the contentious history between the parties here, as well as the prior litigation history, will all be relevant and discoverable in this defamation action.

## III. CAIR MUST PRODUCE DOCUMENTS SPEAKING TO THE TRUTH/FALSITY OF THE ALLEGATIONS THAT IT CLAIMS CONSTITUTE CYBERSTALKING, HARASSMENT AND DEFAMATION

CAIR's primary basis for objecting to discovery relating to the truth of Saroya's statements is that it is purportedly not relevant to this action about CAIR's statements in the Press Release. CAIR is wrong for three reasons. It should thus be obligated to produce documents responsive to Request Nos. 19-23, 32-37 and 40-41, and Interrogatory Nos. 10-11 and 15-19.

### A. True Statements Regarding Matters of Public Concern Cannot Form the Basis for the Crimes of Cyberstalking or Harassment

CAIR itself placed the truth or falsity of Saroya's prior statements about CAIR directly at issue by stating in the Press Release that Saroya was a "cyberstalker" and "harassed" CAIR when she publicly raised her concerns about CAIR. Indeed, in the Press Release, CAIR accused Saroya of cyberstalking in four separate instances, including in the title of the Press Release, which makes that very assertion: *Community Update on*

-24-

*Cyberstalking by Lori Saroya, Ex-Staffer*."  To the extent Saroya's statements were true, though, they cannot constitute cyberstalking or harassment.

In making the statements she did, Saroya was disclosing the truth about her experience with CAIR and CAIR's conduct in an effort to educate the public about the organization.  In doing so, she disclosed unlawful discrimination, harassment and retaliation in a manner akin to that of a whistleblower.  Saroya's conduct in making truthful statements about matters of public concern[11] was protected speech, not unlawful cyberstalking or harassment, because as the U.S. Supreme Court has expressly held for sixty years: "[t]ruth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned . . . . For speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison*, 379 U.S. at 74 (emphasis added); *see also Counterman*, 600 U.S. at 76 (overturning internet stalking conviction – "The First Amendment precludes punishment, whether civil or criminal, unless the speaker's words were 'intended' (not just likely) to produce imminent disorder."); *Grimmett*, 59 F.4th at 692 (striking down criminal statute that prohibited making a "derogatory report" about candidate with reckless disregard of falsity – "[W]e

---

[11] To the extent CAIR takes the position that Saroya's advocacy statements did not involve matters of public concern, Saroya would still be entitled to the discovery she seeks regarding the parties' historical relationship, because the Court "must, on a case-by-case basis, apply the totality of the circumstances test and balance the content, form, and context of the speech, as well as any other pertinent factors, to determine whether speech involves a purely private matter or is a statement about a matter of public concern intended to influence public discussion about desired political or social change." *Johnson v. Freborg*, 995 N.W.2d 374, 385 (Minn. 2023) (emphasis added).

conclude the Act likely criminalizes at least some truthful speech—a step the Constitution forbids.") (emphasis added); *Matter of Welfare of A.J.B.*, 929 N.W.2d at 853 (striking down stalking-by-mail criminal statute because it criminalized conduct at "the core of protected First Amendment speech"). Further, such First Amendment-protected speech about matters of public concern is expressly excluded from the Minnesota cyberstalking and harassment statute. *See* Minn. Stat. § 609.749, subdiv. 7 ([This subsection] "does not impair the right of any individual or group to engage in speech protected by the federal, state, or tribal constitutions . . . ."). Therefore, information demonstrating the truth of Saroya's prior statements bears directly on the falsity of CAIR's allegations that Saroya has acted unlawfully or criminally when it publicly deemed her a "cyberstalker."

Moreover, under Minnesota law, to commit the crime of cyberstalking, an individual must repeatedly deliver electronic communications with the "intent to kill, injure, harass, or intimidate another person." *See* Minn. Stat. § 609.749, subdiv. 2(b); *see also* 18 U.S.C. § 2261A (requiring an "intent to kill, injure, harass, intimidate or place under surveillance with the intent to kill, injure, harass or intimidate"); *State v. Ortega*, 2012 WL 4052361, at *2 (Minn. Ct. App. Sept. 17, 2012) ("a person engages in a pattern of stalking when (a) they commit an act listed in Minn.Stat. § 609.749 . . . (2) the person knows or has reason to know that these actions would cause the victim under the circumstances to feel terrorized or to fear bodily harm, and (3) the person's actions cause such a reaction from the victim."). Documents relating to the truth of Saroya's statements will demonstrate that she was acting with an intention of exposing misconduct, not with the state of mind necessary to commit a crime. They are thus relevant in that they will

demonstrate the falsity of CAIR's allegation that Saroya engaged in cyberstalking and harassment.

**B.    The Discovery Saroya Seeks Is Relevant Because It Speaks to CAIR's Motives in Issuing the Press Release**

In its Answer, CAIR asserts absolute and qualified privilege as a defense.  (Answer dated Mar. 14, 2024 (ECF No. 23) at Affirmative Defense 4.)  In doing so, CAIR put its motive in disseminating the Press Release squarely at issue.  *See Moreno v. Crookston Times Printing Co.*, 610 N.W.2d 321, 328 (Minn. 2000) (noting that common law malice, ill will and improper motive will defeat a qualified privilege).  As Saroya has alleged, CAIR was motivated at least in part by a desire to discredit Saroya for telling the truth about her experiences at CAIR.  (*See, e.g.*, Compl. ¶ 1.)  Documents relating to the truth of Saroya's statements will further demonstrate CAIR's motive was to silence and discredit Saroya, as it has done to others who have spoken up about CAIR's misconduct, in an attempt to preserve its credibility.  Documents relating to the truth of Saroya's statements are thus relevant and discoverable.

**C.    The Discovery Saroya Seeks Is Relevant Because It Speaks to the Falsity of CAIR's Statements About Prevailing and/or Proving Its Claims in the 2021 Litigation**

Among the defamatory statements that are at issue in this litigation are those in the Press Release whereby CAIR asserted that "the judge overseeing the case ruled in our favor" and "the litigation had already allowed us to prove her conduct . . . ."  (Compl. Ex. 4.)  Of course, the conduct that was alleged in the lawsuit was that Saroya had defamed CAIR in making the alleged statements.  (*See, e.g.*, Kerbaugh Decl. Ex. 1 ¶¶ 166-87, 190-

97, 203.) And, of course, truth is a complete defense to defamation. *See McKee v. Laurion*, 825 N.W.2d 725, 730 (Minn. 2013) ("Truth is a complete defense to a defamation claim and true statements, however disparaging, are not actionable.") (quotation omitted); *Alexander v. Ball*, 2021 WL 2201491, at *3 (Minn. Ct. App. June 1, 2021) (same). It is also a defense that Saroya asserted in the 2021 Litigation. (*See, e.g.*, Kerbaugh Decl. Ex. 11 at Introduction, Sixth Affirmative Defense.)

CAIR put the truth or falsity of its allegations about Saroya in the prior litigation, as well as Saroya's statements preceding that litigation, directly at issue by using the Press Release to publicly broadcast to all of its supporters, as well as news outlets, that it had proven Saroya defamed it, and by way of inference, proven Saroya to be a liar making false statements about CAIR. Documents and information demonstrating the truth of the statements at issue in the 2021 Litigation speak directly to whether or not CAIR was able to (or could ever) prove that those statements were defamatory, and thus false. For this reason, too, the Court should order CAIR to produce documents and information responsive to Request Nos. 19-23, 32-37 and 40-41, and Interrogatory Nos. 10-11 and 15-19.

## IV.   THE COURT SHOULD ORDER CAIR TO PRODUCE DOCUMENTS RELATING TO ITS CHAPTERS AND AFFILIATES IN ITS POSSESSION

In her discovery requests, Saroya defined "CAIR," "You" and "Your" as follows:

CAIR Foundation, Inc. d/b/a Council on American-Islamic Relations and CAIR, including any of its parent or subsidiary organizations, affiliates, chapters, agents, representatives, attorneys, or anyone else acting on its behalf and under its control, and expressly includes but is not limited to Washington Trust Foundation, Inc., CAIR Action Network, Inc., Council on

American-Islamic Relations Action Network, Inc. and CAIR National legal Defense Fund, Inc.

(Kerbaugh Decl. Exs. 2-5.)  In response to numerous discovery responses, CAIR objected to this definition, purportedly because it seeks discovery "related to entities that are not parties to this litigation and claims, complaints, or allegations involving entities and their officers, directors or employees who are not parties to this litigation."  (*See, e.g.*, *id.* Ex. 8 at Request Nos. 33-41.)  CAIR's objection to producing documents relating to the chapters and national affiliates has no merit.

First, whether CAIR's chapters and affiliates are separate legal entities is immaterial for establishing whether CAIR should be obligated to produce documents.  *See Prokosch v. Catalina Lighting, Inc.*, 193 F.R.D. 633, 636 (D. Minn. 2000) ("[U]nder Rule 34, 'control' does not require that the party have legal ownership or factual physical possession of the documents at issue; rather, documents are considered to be under a party's control when the party has the right, authority, or practical ability to obtain the documents from a non-party to the action.") (quotation omitted); *see also In re Hallmark Capital Corp.*, 534 F. Supp. 2d 981, 982 (D. Minn. 2008) (same); *Triple Five of Minn., Inc. v. Simon*, 212 F.R.D. 523, 527 (D. Minn. 2002) ("The question, therefore, is not only whether the documents are within the physical possession of the party, but also whether the party has a . . . practical ability to obtain the information.").

Moreover, CAIR's arguments regarding the separateness of CAIR, on one hand, and its chapters and national affiliates, on the other, are inconsistent with reality.  For example, CAIR's own website describes its chapters as CAIR's "offices in cities across the country,"

directs anyone who wants to form a CAIR chapter to do so through CAIR, and states that "CAIR's national board of directors guides the organization . . . ." (Kerbaugh Decl. Ex. 10.) The website identifies the CAIR chapters as part of CAIR and lists the Executive Directors of the various CAIR chapters, virtually all of whom have email addresses ending with "cair.com," a domain owned by CAIR. (*Id.*)

In reality, CAIR's chapters are all a part of a CAIR-wide National Council, which routinely discusses pan-organization matters. (*Id.* Ex. 12 ¶ 4.) CAIR coordinates the activities of its chapters, contributing fundraising, videos, material and themes to the chapters. (*Id.* Ex. 12 ¶ 5.) CAIR controls all chapter press releases, which are composed by its communications head, who edits and sets out public relations matters on their behalf. (*Id.*) CAIR is involved with onboarding and training new hires within CAIR chapters. (*Id.*) CAIR also routinely involves itself in chapter affairs, penalizing chapters and individuals within them, and threatening disaffiliation, for actions that CAIR views as detrimental to its brand. (*Id.*)

Moreover, many of Saroya's statements that CAIR alleged constitute cyberstalking and/or harassment in the Press Release, and alleged were defamatory in the 2021 Litigation, related to the CAIR organization <u>more broadly</u>, and not just CAIR Foundation, Inc. Many of Saroya's statements used "CAIR" as a moniker not just for CAIR Foundation, Inc., but also for the chapters and the national affiliates. (*See, generally*, *id.* Ex. 1.) This is further demonstrated by specific statements regarding, for example, CARE-CA (a chapter), CAIR-NJ (a chapter) and the WTF (a national affiliate). (*See, e.g.*, *id.* Ex. 1 ¶¶ 88, 119.) All of the chapters and affiliates are inextricably intertwined with CAIR and serve core functions

in its national infrastructure.  A statement regarding one is a statement regarding them all.[12]
Finally, many of Saroya's statements were about CAIR handling (i.e., refusal to
investigate, whitewashing, or retaliatory conduct relating to) allegations about CAIR's
offices around the country.

Thus, information relating to CAIR's chapters and national affiliates is relevant to
the truth of statements that CAIR has falsely claimed were criminal and proven defamatory.
The Court should order CAIR to produce information relating to those entities in CAIR's
actual possession, custody and control.  *See In re Hallmark Capital*, 534 F. Supp. 2d at 983
(partner in partnership required to produce partnership documents within partner's
control).

## V.  CAIR CANNOT DEMONSTRATE THAT PRODUCING DOCUMENTS AND INFORMATION RESPONSIVE TO THE REQUESTS, ESPECIALLY AS SAROYA HAS NARROWED THEM, WOULD BE UNDULY BURDENSOME

In addition to relevance, CAIR alleges burdensomeness as an objection to virtually
all of Saroya's discovery requests.  It is axiomatic that the party objecting to discovery
bears the burden of showing that the discovery sought is unduly burdensome.  *See Mead
Corp. v. Riverwood Nat. Res. Corp*., 145 F.R.D. 512, 515-16 (D. Minn. 1992) ("The party
opposing discovery shoulders the burden of showing that [the] discovery request is overly
broad and burdensome . . . and the written objection must allege facts which demonstrate

---

[12] Notably, when Saroya intended to except a component part of the CAIR organization
in her statements, she did so.  This is exemplified by one of the statements that CAIR
alleged was defamatory in which Saroya expressly excluded "the sincere people at CAIR-
MN . . . ."  (Kerbaugh Decl. Ex. 1 ¶ 92.)

the extent and nature of the burden imposed by preparation of a proper response.")
(citations omitted); *Edeh v. Equifax Info. Servs., LLC*, 2013 WL 1749912, at *3 (D. Minn.
Apr. 23, 2013) ("The party resisting discovery must show specifically how each
interrogatory or request for production is not relevant or how each question is overly broad,
burdensome or oppressive."); *Lubrication Techs., Inc. v. Lee's Oil Serv., LLC*, 2012 WL
1633259, at *5 n.5 (D. Minn. Apr. 10, 2012) ("To the extent that the Defendants object to
a discovery request, they cannot rely upon boilerplate objections, but rather they must
specify how each interrogatory or request for production is deficient and articulate the
particular harm that would accrue if they were required to respond to the discovery
request.").

But CAIR has done nothing to meet its burden of showing that a search for the
relevant documents (narrowed in many cases by subject and date range) will be so great as
to justify preventing Saroya from obtaining evidence relating to her claims.  And the scope
of Saroya's requests is not unreasonable where CAIR falsely claimed in the Press Release
that multiple statements from Saroya, contained in CAIR's sprawling 203-paragraph
Complaint in the 2021 Litigation, constituted cyberstalking and harassment, and were
proved to be defamatory.

 After having accused Saroya of cyberstalking, harassment, and defamation based
on dozens of supposed falsehoods, CAIR seeks to withhold evidence that the statements
are actually true by dusting off the predictable, wearisome and incorrect line that Saroya is
engaged in a "fishing expedition."  *See Hickman*, 329 U.S. at 507 (the Rules provide for
"broad and liberal" discovery; "[n]o longer can the time-honored cry of 'fishing

expedition' serve to preclude a party from inquiring into the facts underlying his opponent's case."). Saroya's discovery requests are far from a fishing expedition. She seeks information relating to the extent of CAIR's misconduct, its motives, and the truth of the statements that CAIR claims constituted stalking and harassment, and were defamatory. Since the discovery sought is relevant and CAIR cannot demonstrate undue burden, the Court should order CAIR to produce fulsome responses to the at issue Document Requests and Interrogatories.

## **CONCLUSION**

For the foregoing reasons, Saroya respectfully requests that the Court grant her Motion to Compel in its entirety, ordering CAIR to produce documents responsive to Request Nos. 1-4, 8, 10-16, 18-25 and 32 of Lori Saroya's First Set of Document Requests, documents responsive to Request Nos. 33-41 of Lori Saroya's Second Set of Document Requests, and information responsive to Interrogatory Nos. 4 and 10-19 of Lori Saroya's First Set of Interrogatories by a date certain.

[*Signature Block on Following Page*]

Dated: July 26, 2024                   **SAUL EWING LLP**

By:     *s/ Steven C. Kerbaugh*
Steven C. Kerbaugh (MN #0390429)
33 S. 6th St., Suite 4750
Minneapolis, MN 55402
(612) 225-2946
steve.kerbaugh@saul.com

Jefferey S. Robbins
(admitted pro hac vice)
Joseph D. Lipchitz
(admitted pro hac vice)
Kelsey M. Westrich
(admitted pro hac vice)
131 Dartmouth Street, Suite 501
Boston, MA 02116

*Attorneys for Plaintiff Lori Saroya*