# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Lori Saroya,

      Plaintiff,

v.

CAIR Foundation, Inc. d/b/a Council on
American-Islamic Relations & CAIR,

      Defendant.

Case No.: 24-cv-110 (DWF/DTS)

**DECLARATION OF
LORI SAROYA**

---

I, Lori Saroya, do hereby declare under oath as follows:

1.     I am the Plaintiff in the above-referenced matter, and I submit this Declaration in support of my Motion to Amend the Complaint in order to add as defendants certain individuals who I believe, and who CAIR has itself indicated, to be directly responsible for the conduct which is at issue in this case. I have personal knowledge regarding the matters addressed in this Declaration, all of which are true and correct to the best of my knowledge and belief.

2.     I live in Blaine, Minnesota and have lived here for approximately twenty (20) years. I grew up in Iowa and moved to Minnesota to attend St. Catherine University. I later earned my Juris Doctor from Mitchell Hamline School of Law.

53640216.3

**My Extensive Background And Involvement In CAIR National, And My Familiarity With The Six Proposed Individual Defendants**

3.      My involvement with the Council on American Islamic Relations ("CAIR") began in college in 2007, when I co-founded CAIR's Minnesota Chapter ("CAIR-Minnesota").

4.      I served as Executive Director of CAIR-Minnesota from 2009 to 2015, and in that capacity was regularly in communication with CAIR's national leaders, including the proposed Individual Defendants Nihad Awad ("Awad") and Ibrahim Hooper ("Hooper"), CAIR's national director and communications director, respectively.  Both regularly communicated with me and with CAIR Minnesota's directors, donors and lay leaders by email, telephone, text and/or letter, and this remained true when I was, as described below, recruited by Mr. Awad and Roula Allouch ("Allouch"), former Chair of the CAIR National Board of Directors, in 2016 to become a member of CAIR's national leadership team, reporting directly to Mr. Awad as the chapter director and to Ms. Allouch as a member of its national board of directors.  As detailed herein, the proposed Individual Defendants also regularly disseminated, by internet post and email, content to residents of Minnesota regarding issues in Minnesota for the purposes of obtaining donations from Minnesota residents and garnering support within Minnesota for CAIR's work.  *See* Exhibits J - M.  I left CAIR National in 2018, but since then this has remained true, which I know, among other things, from CAIR National's various lists, from my continuing significant involvement with Minnesota's Muslim community and from my ongoing relationship with CAIR's office in Minnesota.

5.     As noted, in 2016, Mr. Awad and Ms. Allouch asked me to assume the role of national board member and later its national director of CAIR's state chapters, which included its CAIR-Minnesota office.  As such, I was part of CAIR's senior management team.  Mr. Awad was head of that management team, Mr. Hooper functioned de facto as his deputy, and Ms. Allouch was the top official at CAIR.  I interacted with them on a daily and ongoing basis, speaking with them constantly, receiving communications they sent into Minnesota, traveling with them in Minnesota, meeting and consulting with them in Minnesota and booking hotels for them in Minnesota, and as such observed and was frequently part of their communications with CAIR's Minnesota office and CAIR's Minnesota employees, its donors, its lay leaders, its directors and its Minnesota community partners.  These communications were Minnesota-related operational directives, directives about personnel matters in Minnesota, directives about legal actions in Minnesota, communications about fundraising in Minnesota, and other communications to and with Minnesota residents, and within Minnesota.  Minnesota has a sizable Muslim community and provides a significant donor base for CAIR National and Mr. Awad, Mr. Hooper, Ms. Allouch, and the rest of CAIR's leadership team were constantly sending communications and directives to Minnesotans.

6.     Set forth in the following subsections are examples of the activities by the proposed Individual Defendants which were related to, directed into, or conducted within, Minnesota.

**Nehad Awwad Hammad, also known as Nihad Awad**

7.     As stated above, Mr. Awad is CAIR's National Executive Director. CAIR has acknowledged in interrogatory responses served in connection with this action that Mr. Awad was involved in drafting and/or revising the Press Release that forms the basis of this litigation. The interrogatory responses are attached hereto as Exhibit A.

8.     Mr. Awad resided in Minnesota for years, where he was an engineering student at the University of Minnesota involved in numerous campus organizations, an office worker at the University of Minnesota Hospital and Clinic, a member of the Board of Directors of the Islamic Center of Minnesota, and a writer/publisher of op-eds in Minnesota newspapers, in particular the Star Tribune.  Moreover, Mr. Awad married in Hennepin County, Minnesota in May of 1987.  Public and publicly-available records corroborating this are attached hereto as Exhibit B.

9.     The extent of Mr. Awad's involvement with Minnesotans and Minnesota resources is further evidenced by an op-ed on Bosnia he wrote for the Star Tribune in 1992, in which he stated that he would "soon return to Bosnia to deliver another shipment of food, clothing, and medical supplies donated by the people of Minnesota."  As the coordinator for the Bosnian Relief Committee and member of the Muslim Student Association at the University of Minnesota, Mr. Awad ended the op-ed by requesting that Minnesota residents donate by calling his organization directly.  This article, titled *Bosnia: high hopes, empty shelves*, is attached hereto as Exhibit C.

10.     When I was co-founding CAIR-Minnesota in 2007, Mr. Awad, by then head of CAIR National, introduced me to friends and donors of his in Minnesota, including Holy Land Grocery owner Majdi Wadi, Minnesota businessman Ali Giarushi and Mr. Awad's cousin, Minnesota resident Randy Hammad.  These Minnesota residents regularly invited Mr. Awad to Minnesota, where they hosted him here for group meals, meetings, fundraisers and other Minnesota events, among other places at mosques in and around the Twin Cities.  Mr. Awad regularly accepted the invitations to visit Minnesota, traveled to Minnesota, and participated in these activities in Minnesota.

11.     Mr. Awad, Mr. Hooper and others on CAIR's national leadership team were directly involved in CAIR-Minnesota's operations, including in the selection and training of Minnesota board members and hiring and onboarding of Minnesota residents to work in the CAIR-Minnesota office.  By way of limited example, when we were hiring our first employee in CAIR-Minnesota's office, Mr. Awad sent a CAIR National employee, Yasir Tabbara, to Minnesota to interview candidates and participate in the hiring decision.  When I resigned from CAIR-Minnesota to focus on a fellowship I had received, I was required to personally inform Mr. Awad.  When I wished to hire a new executive director for CAIR-Minnesota, Jaylan Hussein, it was required that Mr. Awad personally approve Mr. Hussein's hiring for the Minnesota office or our chapter would be disaffiliated.  It was Mr. Awad, Mr. Hooper and others on CAIR's leadership team who reported to them who directed the Minnesota office's use of email addresses, website design and hosting and listservs.  They also conducted background checks, using CAIR National's HireRight account, on new board members and employees in Minnesota's

office.

12.     As an example of Mr. Awad's direction of CAIR-Minnesota's operations

and his supervision of those operations, attached hereto as Exhibit D is an email dated

August 5, 2017 from Mr. Awad, stipulating a reward related to a mosque arson: "I spoke

to Ibrahim [Hooper] and [Minnesota-based attorney] Amir and will raise the reward to

$10,000 to support the reinforcement efforts and also acknowledge the M[uslim]

A[merican] S[cociety]-Minnesota award as well."

13.     Mr. Awad regularly visited Minnesota and spoke at CAIR-Minnesota

banquets, Ramadan dinners and galas.  During these visits he would also meet with

individual donors and potential donors residing in Minnesota and speak at Minnesota

mosques.

14.     For example, in 2016, CAIR's National Board held its meeting in

Minnesota, and flew all of its board members—including proposed Individual

Defendants Mr. Awad and CAIR Board Chair Roula Allouch—to Minnesota.  I was on

the National Board at the time and picked Mr. Awad and others up at the airport and took

them to the hotel, where the Board meeting took place on February 26 and February 27,

2016.  Attached hereto as Exhibit E is the agenda for that board meeting, as well as an

email from proposed Individual Defendant Ms. Allouch, who attended the meeting, about

that agenda.

15.     During that visit, Mr. Awad informed me, in connection with a discussion

about fundraising, that he relied on large donors from Minnesota to fund CAIR

National's operation.  During this visit Mr. Awad was also a featured speaker at a CAIR-

6

Minnesota banquet and fundraiser. Mr. Awad has also told me that he communicates directly with Minnesota Attorney General Keith Ellison and State Senator Zaynab Mohamed, the former Community Advocacy Director of CAIR-Minnesota.

16.     As my direct supervisor, Mr. Awad interacted with me, and I interacted with him, on a regular and ongoing basis, from and within Minnesota, speaking with him about the challenges and concerns I experienced as a Minnesota-based employee of CAIR. These included concerns around issues at CAIR that included discrimination, harassment, retaliation, union busting, financial mismanagement, lack of board oversight, board incompetence, creation of a hostile work environment, negatively portraying Muslims, making mistakes on legal cases, receiving foreign funding, and more.

### Cary Douglas Hooper, also known as Ibrahim Hooper

17.     Mr. Hooper is CAIR's National Communications Director. CAIR has acknowledged in interrogatory responses served in connection with this action that Mr. Hooper was involved in drafting and/or revising the Press Release that forms the basis of this litigation. *See* Exhibit A.

18.     As noted, Mr. Hooper and others on CAIR's national leadership team were directly involved in CAIR-Minnesota's operations, including in the selection and training of Minnesota board members and hiring and onboarding of Minnesota residents to work in the CAIR-Minnesota office. Additionally, it was Mr. Hooper, Mr. Awad, and others on CAIR's leadership team who reported to them who directed the Minnesota office's use of email addresses, website design and hosting and listservs.

7

19.    According to public and publicly-available records and, in particular, newspaper articles attached hereto as Exhibit F, Mr. Hooper attended the University of Minnesota under the name Cary Douglas Hooper.  He was a member and representative of the Islamic Council of Minnesota, the public relations director for the Islamic Center of Minnesota, the office manager for the Minnesota Council for Peace and Justice in the Middle East, a member of the Twin Cities Commission for the Liberation of South Africa, the community coordinator for the Islamic Information Service, and a member of various other Minnesota-based groups.  *Id.*  In addition, Mr. Hooper published op-eds in the Minnesota Star Tribune, advertised himself as a speaker about Islam and related subjects available to the Minnesota community, and even ran for the Minnesota State Senate in 1982.  *Id.*

20.    An example of Mr. Hooper's involvement in the Minnesota community is illustrated by Mr. Hooper himself in an op-ed he wrote for the Star Tribune in 1992 titled, *Muslims have reason to be wary*, attached hereto as Exhibit G.  Mr. Hooper wrote that he took part in one of the Star Tribune's citizen observer groups and met a Minnesota bishop with whom he discussed strategies to open a "center for Christian-Muslim dialogue" in northern Nigeria.  *Id.*  Mr. Hooper also wrote that he had recently sat in on a missionary class at a Twin Cities Bible college to observe students learning about Islamic cultural norms.  *Id.*

21.    Mr. Hooper lived, or at least owned a residence, at 2612 16th Avenue South in Minneapolis, Minnesota from 1987 through at least 1997.  *See* Exhibit H.  According to Minnesota state databases, he owned and operated two Minnesota businesses, one

called Halal Company and the other called Press Pass Media Relations, which both list

2612 16th Avenue South as their principal place of business.  *See* Exhibit I.

22.    Mr. Hooper grew up in Minnesota, attended the University of Minnesota

both as an undergraduate and as a graduate student, and attended William Mitchell

College of Law in St. Paul for at least one semester.  *See* Exhibit F.  He was at one point

employed by KSTP-TV in Minnesota as a news producer.  *Id.*

23.    Mr. Hooper is responsible at CAIR for drafting, editing, approving and

distributing CAIR-Minnesota's press releases.  Indeed, Mr. Hooper has an extensive track

record of issuing both CAIR-Minnesota and CAIR National press releases into Minnesota

directly addressing significant Minnesota political and social issues, intended to be read

in Minnesota by Minnesota residents.  Importantly, these press releases name Mr.

Hooper, and sometimes other proposed Individual Defendants as noted below, as contact

persons with, and sometimes without, CAIR-Minnesota representatives or attorneys.

Collections of these press releases are attached hereto as Exhibits K, L, and M.  The

substance of these press releases highlights: (1) the political and social issues deeply tied

to Minnesota in which Mr. Hooper and other proposed Individual Defendants involved

themselves, (2) the proposed Individual Defendants' attempts to spark public change in

Minnesota on a municipal and state level by, for example, calling for public support from

Minnesotans on various issues, calling for the resignation of certain Minnesota political

leaders, demanding the arrest of Minnesota law enforcement members, urging municipal

and state authorities to institute or change various Minnesota laws, and advertising

CAIR's initiation of legal actions in Minnesota against Minnesota residents and entities,

and (3) the proposed Individual Defendants' intent that the press releases be consumed by residents of Minnesota, evidenced by the fact that the articles clearly attempt to garner public support for certain stances on Minnesota issues, which requires that Minnesotans actually receive and read such press releases. *Id.* By way of <u>limited</u> example, these press releases include:

- A March 5, 2020 press release issued into Minnesota titled, *CAIR-Minnesota Calls for Hate Crime Probe of Vandalism Targeting Mosque, Muslim Business*, written and published by Mr. Hooper, in which he called on law enforcement authorities "to investigate a possible vandalism targeting Masjid Al Nur and a Muslim-owned business in Minneapolis" and encouraged "[a]nyone who has any information [to] contact the Minneapolis Police Department."

- An April 18, 2020 press release issued into Minnesota titled, *CAIR Offers Condolences on Passing of Minnesota Attorney General Keith Ellison's Mother Due to COVID-19*, written and published by Mr. Hooper, in which he offered condolences to the Minnesota Attorney General, with whom certain proposed Individual Defendants had a relationship.

- A May 26, 2020 press release issued into Minnesota titled, *CAIR-Minnesota Calls for Arrest of Police Officers Involved in Choking Death of George Floyd in Minneapolis*, written and published by Mr. Hooper, in which he called for "the immediate arrest of the two Police officers involved in choking and killing George Floyd."

53640216.3

- A May 29, 2020 press release issued into Minnesota titled, *CAIR Calls on Minn. National Guard to Reject Trump's 'Racist and Illegal Threat,' Encourages Suspension of President's Twitter Account*, written and published my Mr. Hooper, in which he encouraged "the Minnesota National Guard to affirm that it will disobey any unlawful orders to harm protestors."

- A June 9, 2020 press release issued into Minnesota titled, *CAIR-Minnesota Calls for Firing of Minneapolis Police Officer Who Shared White Supremacist Threats Against Cedar Riverside Neighborhood*, written and published by Mr. Hooper, in which he demanded that the Minneapolis Police Department fire a police officer who threatened a predominantly Muslim neighborhood.  He also demanded that local law enforcement investigate reports that law enforcement agency officers "knifed the tires of vehicles in at least two locations during the recent anti-racist protests in Minneapolis."

- A June 29, 2020 press release issued into Minnesota titled, *CAIR-Minnesota Calls on Stillwater Officials to Ensure Safety of Minorities After Biker Harassment of Muslim Mother and Child*, written and published by Mr. Hooper, in which he demanded that officials in Stillwater, Minnesota take "concrete actions to ensure the safety of members of the Muslim and other minority communities."

- A July 26, 2020 press release issued into Minnesota titled, *CAIR-Minnesota Condemns Nazi-Swastika Mask Incident in Southwestern Minnesota*, written and published by Mr. Hooper, in which he denounced two Walmart shoppers'

offensive actions related to swastika face masks and called on Walmart and Minnesota public officials to "repudiate the hate represented by the customers' actions."

- A July 29, 2020 press release issued into Minnesota titled, *CAIR-Minnesota Seeks Charges for Apparent White Supremacist 'Umbrella Man' Incitement of Violence During George Floyd Protests*, written and published by Mr. Hooper, in which he called for "charges to be brought against a 32-year-old white supremacist suspected of vandalizing a Minneapolis auto parts store in the aftermath of the murder of George Floyd."

- A September 15, 2020 press release issued into Minnesota titled, *CAIR, CAIR-Minnesota to Announce Lawsuit on Behalf of Jacob Letourneau-Elsharkawy's Estate Against Chisago Lakes School District*, written and published by Mr. Hooper, in which he announced that CAIR-Minnesota would file "a federal lawsuit on behalf of Jacob Letourneau-Elsharkawy's estate to seek justice for Jacob's family and to fight for positive changes in how Chisago Lakes School District and other schools in Minnesota address bullying."

- An October 13, 2020 press release issued into Minnesota titled, *CAIR-Minnesota Calls for Community Support After St. Paul Mosque Vandalized Multiple Times*, written and published by Mr. Hooper, in which he "[sought] community support for St. Paul's Dar Uloom Islamic Center" in Minneapolis, Minnesota and provided a direct website link for Minnesotans to donate to the center.

53640216.3

- An April 12, 2021 press release issued into Minnesota titled, *CAIR-Minnesota Condemns City-Imposed Curfew on First Night of Ramadan, Seeks Exemption for Religious Purposes*, written and published by Mr. Hooper, in which he criticized "the city of St. Paul-Minneapolis' decision to impose a curfew on the first night of Ramadan" and also called for "the immediate termination of the Brooklyn City police officer who shot and killed Daunte Wright during a traffic stop on April 11."

- An April 25, 2021 press release issued into Minnesota titled, *CAIR-MN Calls for Updated Hate Crime Law After Anti-Muslim, Racist Graffiti Sprayed on Minnesota Mosque*, written and published by Mr. Hooper, in which he called on "local, state and federal law enforcement authorities to investigate anti-Muslim, neo-Nazi and racist graffiti sprayed on a mosque in Moorhead, Minnesota, as a hate crime." Moreover, he called on "state lawmakers to pass a bill updating Minnesota's hate crime legislation."

- An April 12, 2023 press release issued into Minnesota titled, *CAIR-Minnesota to Urge Minneapolis City Council to Allow 5-Daily Calls to Prayer*, written and published by Mr. Hooper, in which he vowed that CAIR-Minnesota, "along with faith leaders from across the state, [would] attend the Minneapolis City Council meeting during which the council [would] vote on a noise ordinance change that would allow for the Islamic call to prayer to be broadcast from loudspeakers for all five daily prayers in Minneapolis."

13

- An April 13, 2023 press release issued into Minnesota titled, *CAIR-MN Welcomes Resolution Allowing Public Broadcast of Islamic Call to Prayer 5 Times Daily in Minneapolis*, written and published by Mr. Hooper, in which he expressed CAIR's support for the passing of a resolution, thanked "the members of the Minneapolis City Council for setting this great example, and [urged] other [Minnesota cities] to follow it."

- An August 7, 2024 press release issued into Minnesota titled, *CAIR-MN Calls for Resignation of Lino Lakes City Council Member Who Said Hate-Filled, Anti-Muslim Email is 'Best I have Ever Received'*, mentioned further below and attached separately hereto as Exhibit M, written by Mr. Allison and listing Mr. Hooper as the contact person should any Minnesota resident wish to communicate with CAIR regarding the issues. The press release, expressing displeasure with Minnesota political leaders, went as far as to call for the resignation of a Minnesota politician, Lino Lakes City Council Member Christopher Lyden, and condemned a vote by the Lino Lakes City Council to halt the progress on the Madina Lakes project.

24.     Mr. Hooper also offers in-person media trainings to Muslim and non-profit leaders in Minnesota in partnership with CAIR-Minnesota. He is regularly invited by CAIR-Minnesota to speak at banquets, dinners and galas in Minnesota, and regularly visits his family (mother, brother) in northern Minnesota. My house was an approximate halfway point between his family home and the airport, so Mr. Hooper would often take a travel break and stop by to see me and my family on his way to or from visiting his

14

53640216.3

family in Minnesota.

25.     Attached hereto as Exhibit N is a photo of Mr. Hooper taken on or about July 25, 2021 in George Floyd Square in Minneapolis published on social media.

### Roula Allouch

26.     Ms. Allouch is former Chair of the CAIR National Board of Directors and is currently co-chair on its Emeritus Board.  CAIR has acknowledged in interrogatory responses served in connection with this action that Ms. Allouch was involved in drafting and/or revising the Press Release that forms the basis of this litigation. *See* Exhibit A.

27.     As noted above, in 2016, CAIR National booked and paid for flights for its entire board to attend a board meeting in Minnesota.  This included Board Chair Roula Allouch.  During that visit, she was a featured speaker at a CAIR-Minnesota banquet and fundraiser.

28.     Ms. Allouch also provides a monthly conference call and online and in-person trainings for chapter board chairs, including CAIR-Minnesota's board chair.

### Thania Clevenger

29.     Ms. Clevenger is CAIR's Chief Operating Officer.  CAIR has acknowledged in interrogatory responses served in connection with this action that Ms. Clevenger was involved in drafting and/or revising the Press Release that forms the basis of this litigation. *See* Exhibit A.

### Edward Mitchell

30.     Mr. Mitchell is CAIR's National Deputy Director.  CAIR has acknowledged in interrogatory responses served in connection with this action that Mr.

Mitchell was involved in drafting and/or revising the Press Release that forms the basis for this litigation. *See* Exhibit A.

31.     Mr. Mitchell also has an extensive track record of issuing both CAIR-Minnesota and CAIR National press releases into Minnesota directly addressing significant Minnesota issues.  Importantly, many of these press releases named Mr. Mitchell and other proposed Individual Defendants as contact persons, but did not list any CAIR-Minnesota representatives or attorneys.  A collection of these press releases is attached hereto as Exhibits J, K, and M.

32.     For example, on October 4, 2023, Mr. Mitchell participated in issuing a press release into Minnesota regarding CAIR-Minnesota and CAIR National's lawsuit in Minnesota against Minnesota's DCI Waseca, a federal correctional institution. *Id.*  The press release, titled *CAIR Files Suit Against Minnesota Federal Correctional Facility for Removing Muslim Woman's Hijab*, provided substantive details of the lawsuit and accused the correctional facility of violating the rights of Minnesotans. *Id.*  Mr. Mitchell listed himself as a contact person on this press release, which was designed to inform the Minnesota community of CAIR's legal actions taken in Minnesota and garner support from those who read the press release. *Id.*

33.     On August 7, 2024, Mr. Mitchell participated in issuing a press release into Minnesota, as described above, regarding Minnesota political issues, intended to be read in Minnesota by Minnesota residents.  Furthermore, he listed himself as the contact person should any Minnesota resident wish to communicate with CAIR.  The press release is attached hereto as Exhibit M.  As noted, this press release dealt extensively

16

with Minnesota politicians and called for the resignation of a city council member.  *Id.*

34.     Mr. Mitchell also took part in issuing press releases titled, *CAIR Joins USCMO in Condemning Smears Targeting Minnesota Muslim Community* (August 20, 2024) and *CAIR-MN Condemns Neo-Nazi Antisemitic Vandalism targeting Synagogue* (December 17, 2024).  *See* Exhibit K.  Mr. Mitchell listed himself as a contact person on these press releases, which were designed to inform the Minnesota community of CAIR's opinions, and actions taken, regarding issues affecting Minnesotans.  *Id.*

35.     In addition, Mr. Mitchell drafted and approved CAIR-Minnesota's position statements on CAIR working with the ADL and with the LGBTQ community, as represented in the meeting minutes from the May 6, 2018 Business Session from the National Council Meeting, attached hereto as Exhibit O.

**<u>Ismail Allison</u>**

36.     Mr. Allison is an author of content posted on CAIR's website and the person identified on CAIR's website as having posted the Press Release about me that forms the basis for this litigation with the approval and at the direction of the other proposed Individual Defendants.  *See* Exhibit P.

37.     As noted above for other proposed Individual Defendants, Mr. Allison also has an extensive track record of issuing both CAIR-Minnesota and CAIR National press releases into Minnesota directly addressing significant Minnesota issues.  *See* Exhibit J, K, and M.  Importantly, many of these press releases named Mr. Allison as an official author and contact person but did not list any CAIR-Minnesota representatives or attorneys.  *Id.*

38.     For example, in addition to the October 4, 2023 press release described above, Mr. Allison also took part in issuing press releases titled *CAIR Joins USCMO in Condemning Smears Targeting Minnesota Muslim Community* (August 20, 2024) and *CAIR-MN Condemns Neo-Nazi Antisemitic Vandalism targeting Synagogue* (December 17, 2024). *See* Exhibit K.  Mr. Allison listed himself as a contact person on, and the official author of, these press releases, which were designed to inform the Minnesota community of CAIR's opinions, and actions taken, regarding issues affecting Minnesotans. *Id.*

39.     On August 7, 2024, Mr. Allison participated in issuing, and is labeled as the official author of, a press release into Minnesota regarding Minnesota political issues, intended to be read in Minnesota by Minnesota residents, as described above. *See* Exhibit M.   Furthermore, he listed himself as the contact person should any Minnesota resident wish to communicate with CAIR. *Id.*  This press release dealt extensively with Minnesota politicians and even called for the resignation of a city council member. *Id.*

**At The Time Of The Press Release, The Proposed Individual Defendants Clearly Knew I Lived In Minnesota And Knew I Would Feel The Effects There, And The Effects Were In Fact Felt In Minnesota**

40.     At the time of the Press Release issued into Minnesota by the proposed Individual Defendants on January 20, 2022, the proposed Individual Defendants were fully aware that I lived in Minnesota and that I would experience the major effects of their statements in Minnesota, where I have deep professional and personal ties.

41.     As noted, the proposed Individual Defendants were intimately familiar with my residence in Minnesota since, at the very latest, 2007 when I co-founded CAIR's

18

Minnesota chapter.  Moreover, I was also a leader in my local community and it was therefore public knowledge that I maintained my professional life within Minnesota and that any damage to my professional reputation would be felt primarily within Minnesota.

42.    Mr. Awad, Mr. Hooper, and Ms. Allouch in particular, had a detailed knowledge of my personal and professional presence in Minnesota and my ongoing involvement in the community.  Mr. Awad and Ms. Allouch personally recruited me from Minnesota to join CAIR National's leadership team in 2016.  Even after my departure from CAIR National in 2018, the proposed Individual Defendants were aware that I continued to reside in Minnesota, continued to maintain significant ties to the state's Muslim community, and continued to serve an active role in local civil rights and community leadership.

43.    In addition to the above, CAIR knew that I resided in Minnesota because they filed suit against me in Minnesota in this very Court in May of 2021, alleging in a 130-page complaint that I defamed them by advocating against CAIR's improper treatment of women.  CAIR sought both damages and an injunction to silence to me regarding my experience.

44.    During the litigation, which CAIR pursued extensively in Minnesota, this Court (Nelson, J.) held a hearing raising concerns that the CAIR Action against me did not allege any actionable conduct.  Specifically, Judge Susan Richard Nelson interrupted CAIR's attorneys during their oral argument and stated, " . . . I appreciate that a complaint can certainly create context and tell a story and your complaint does that, but it's very hard to sort out what is actionable and what's not.  It's not at all hard to see what

19

you believe is defamatory, but what is actionable and not actionable is not clear at all from the face of the complaint." The Hearing Transcript is attached hereto as Exhibit Q. Judge Nelson then ordered CAIR to file a narrowed amended complaint within two weeks to avoid dismissal. *Id.*

45.     Unable to comply with Judge Nelson's orders, and with discovery motions pending that may well have forced CAIR to disclose evidence that could prove the truth of statements CAIR claimed were defamatory, CAIR effectively admitted defeat and decided to voluntarily dismiss its action against me in its entirety, which the Court did with prejudice.

46.     Thereafter, CAIR and the proposed Individual Defendants decided to issue into Minnesota the subject Press Release which severely mischaracterized the Minnesota lawsuit and Judge Nelson's decision. The Press Release, attached hereto as Exhibit P, not only accused me of "cyberstalking" but remarkably claimed that ". . . Lori was not able to defeat our lawsuit. A few weeks ago, the judge overseeing the case ruled in our favor and denied Lori's motion to dismiss our lawsuit." *Id.* This Press Release, in which the proposed Individual Defendants intentionally misrepresented the result of a Minnesota lawsuit against a Minnesota resident presided over by a federal judge in Minnesota, was intentionally directed at the forum in which the current action is now brought – Minnesota.

47.     By issuing the Press Release into Minnesota, the proposed Individual Defendants knew that their false statements would cause me harm in Minnesota, where, as evidenced above, they knew I lived, worked, and remained a respected community

leader.  The proposed Individual Defendants were fully aware that, despite the Press
Release being accessible to the entire country, Minnesota is where most people would
read it because it related to Minnesota issues.  As such, they knew that the effects of the
Press release would be most acutely felt in Minnesota, including damage to my reputation
and standing among my professional and personal networks.

48.     Indeed, I received notice of the Press Release, read the Press Release, and
felt the effects of the Press Release in Minnesota, which included significant damage to
my reputation and severe emotional distress.  By way of limited example, as a result of
the Press Release being distributed into Minnesota, I became the subject of online
harassment and bullying in Minnesota, I was alienated from members of my religious
community in Minnesota, I lost potential employment opportunities in Minnesota, and I
suffered physical manifestations of my severe emotional distress in Minnesota.

49.     Specifically, several Minnesotans told me they read it, including Minnesota
residents who confronted me at my mosque – which I had to stop attending.  I turned
inward and tried to put CAIR behind me and move forward.  Despite my hope that this
would not continue to affect my personal and professional life, I was unfortunately
mistaken.  In the summer of 2022, the Press Release came up during a job interview.
When I asked the hiring manager how he knew about it, he said he googled my name and
it was the first thing that came up.  I then googled my own name and realized that he was
right – the top result was the Press Release.  I did not receive a job offer from any
Minnesota-based employer who brought up the Press Release.  At the time, I was also
running for city council and the Press Release came up frequently from Minnesota

21

residents while I was door knocking in my district.  It was also used by my opponent and his team to attack me and piggy back off CAIR's false accusation that I have a criminal record of cyberstalking.

**When I Filed This Action, I Was Mistaken As To The Roles That CAIR And The Proposed Individual Defendants Had In Actually Drafting, Revising, And Publishing The Press Release**

50.    As noted, CAIR's website listed Mr. Allison, and only Mr. Allison, as the author and poster of the Press Release about me that forms the basis of this litigation. *See* Exhibit P.  In stark contrast to CAIR's numerous other press releases that provide specific individual points of contact, this Press Release only listed the author.

51.    Therefore, while I was obviously aware of positions the Individual Defendants held at CAIR and the roles they had in such positions, what the Press Release did not say, and what we did not know until we saw the interrogatory answers, was the <u>actual</u> role that Mr. Awad, Mr. Hooper, Mr. Allison, Ms. Clevenger, Ms. Allouch, and Mr. Mitchell had in <u>actually</u> drafting and revising the Press Release.

52.    If we had known that the Individual Defendants had an <u>actual</u> role in <u>actually</u> drafting and revising the Press Release, we would have included them as Defendants in the first instance.

53.    It was not until we reviewed CAIR's answers to interrogatories that we learned of the Individual Defendants' <u>actual</u> roles.  *See* Exhibit A.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 3rd day of January, 2025

/s/ Lori Saroya
Lori Saroya

53640216.3